**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

KINGSTOWN CAPITAL MANAGEMENT, L.P.; KINGSTOWN PARTNERS MASTER LTD.; KINGSTOWN PARTNERS II, L.P.; KTOWN, LP; KINGSTOWN CAPITAL PARTNERS LLC; INVESTHOLD LTD; and VERALI LIMITED,

                                        Plaintiffs,

              v.

RADOVAN VITEK; CPI PROPERTY GROUP, S.A.; J&T BANKA, A.S.; POSTOVA BANKA, A.S.; JAN GERNER; MILADA MALA; JEAN-FRANÇOIS OTT; LUMIR SAFRANEK; PAVEL SPANKO; and JULIUS STRAPEK,

                                        Defendants.

**COMPLAINT**

**JURY TRIAL DEMANDED**

## Table of Contents

NATURE OF ACTION ............................................................................................... 1

THE PARTIES ........................................................................................................... 3

    *The Plaintiffs* ....................................................................................................... *3*

    *The Defendants and their Affiliates* .................................................................. *5*

JURISDICTION AND VENUE ................................................................................. 9

FACTUAL ALLEGATIONS ..................................................................................... 9

I.     The Rise of Radovan Vitek's Real Estate Empire ......................................... 9

II.     Vitek Expands His Real Estate Empire Through Fraud, Money Laundering,
    And Other Crimes ....................................................................................... 13

    A.     Jean-Francois Ott Induces Kingstown Capital to Invest in ORCO ...... 13

    B.     Vitek Devises a Scheme to Acquire Control of ORCO And Then Loot It
    Of Its Most Valuable Assets ................................................................ 15

    C.     ORCO Is Restructured and Reorganized with the Help of Its New
    Investors, and Vitek Attempts to Use the Restructuring To Take Control of
    the Company ...................................................................................... 20

    D.     Vitek Partners with Ott to Control ORCO and Continue Looting Its Assets
    After the Restructuring ....................................................................... 22

    E.     Vitek Directs Ott to Secure Board Approval to Sell ORCO's Assets at
    Deflated Prices to Entities Controlled by Vitek ................................... 27

    F.     Vitek and Ott Continue to Deceive Kingstown Capital, and Vitek
    Unsuccessfully Attempts to Take Over the Restructured ORCO at the
    February 2013 Shareholder Meeting .................................................. 28

    G.     Vitek and Ott Complete the Looting of an ORCO Asset Even Before the
    First Meeting of the Newly-Elected Board .......................................... 31

    H.     Vitek, with Ott's Help, Fraudulently Takes Over ORCO's Day to Day
    Operations .......................................................................................... 35

    I.     J&T Banka, Acting in Concert With Vitek, Takes Over a Majority of the
    Endurance Office Sub-Funds and Control Over Its Advisory Board .... 36

J.      Vitek Allows ORCO to Raise Funds From Kingstown Capital to Avoid Liquidation, and Allow Vitek to Develop Plans to Raid It ................................... 39

K.      Vitek Completes the Looting of the Assets Formerly Held by the Endurance Office Sub-funds ................................................................ 42

L.      Vitek Engages in Covert, Self-Dealing Transactions to Bypass ORCO's Shareholders and Acquire ORCO Germany ........................................ 43

M.      Vitek Removes Ott from ORCO's Board of Directors, Then Pays Him a Kickback from ORCO's Assets to Continue Their Deception ............................ 53

N.      Vitek Secretly Acquires A Controlling Interest In ORCO Germany ................. 54

O.      Vitek Fails to Honor Investhold Group's Right to Oversight and Joint Control of Partnership Investments, and Defrauds It Of Its Interest in Assets of ORCO Germany ................................................................... 55

P.      Vitek Secretly Acquires Majority Control of ORCO ........................................... 60

Q.      Vitek Formalizes His Partnership With Investhold – Even As He Continues To Deceive It ......................................................................... 61

R.      J&T Group Pressures Vitek To Pay Off Some Of His Improper Loans In Light Of Its Potential Acquisition By A Chinese Company ................................ 63

S.      Vitek Secretly Causes CPI PG To Take On Approximately €800 Million In Debt To J&T Banka To Finance His Scheme ................................... 66

T.      Despite Agreeing To Provide Complete Information, Vitek Continues To Hide CPI PG's Debts ................................................................... 71

U.      Vitek Exploits His Control Over CPI PG To Defraud Investhold ...................... 72

V.      Investhold and Vitek Terminate the "Parity Partnership," and Vitek Defrauds Investhold Again ................................................................... 74

W.      Vitek Completes His Takeover of CPI PG ........................................................... 76

X.      Vitek Completes His Takeover of ORCO ........................................................... 77

Y.      Vitek Breaches the Buyout Agreement – Which He Never Intended To Honor ................................................................................... 78

Z.      Vitek and Ott Come Under Investigation And Are Found To Have Repeatedly Violated European and Local Law ................................... 79

FIRST CAUSE OF ACTION ...................................................................................... 83

SECOND CAUSE OF ACTION ................................................................................................ 98

THIRD CAUSE OF ACTION .................................................................................................. 101

FOURTH CAUSE OF ACTION ............................................................................................. 105

FIFTH CAUSE OF ACTION ................................................................................................... 105

SIXTH CAUSE OF ACTION .................................................................................................. 106

SEVENTH CAUSE OF ACTION ........................................................................................... 106

EIGHTH CAUSE OF ACTION .............................................................................................. 107

PRAYER FOR RELIEF ......................................................................................................... 107

Jury Trial Demanded.............................................................................................................. 108

Plaintiffs Kingstown Capital Management, L.P., Kingstown Partners Master Ltd., Kingstown Partners II, L.P., Ktown, LP, Kingstown Capital Partners LLC, Investhold Ltd., and Verali Limited bring this action against the above-named defendants Radovan Vitek, CPI Property Group, S.A., J&T Banka, a.s., Postova Banka, a.s., Jan Gerner, Milada Mala, Jean-François Ott, Lumir Safranek, Pavel Spanko, and Julius Strapek, alleging as follows:

## NATURE OF ACTION

1.      For over a decade, Czech oligarch Radovan Vitek perpetrated a massive scheme to defraud his business partners, making him one of the wealthiest people in the world.  Vitek, who oversaw a growing conglomerate of commercial and residential real estate portfolios throughout Europe, repeatedly and through a pattern of racketeering activity – including wire fraud, mail fraud, money laundering, and other crimes – made himself into a multi-billionaire at the direct expense of his business partners.

2.      Plaintiff Kingstown Capital Management L.P. and its affiliates were one such victim.  Kingstown Capital established a substantial interest in ORCO Property Group, S.A., a Luxembourg-based real estate development company, and its eventual parent company, CPI Property Group, S.A.  Unbeknownst to Kingstown Capital, however, Vitek secretly took control of ORCO through a series of shell companies and straw owners – including ORCO's Chief Executive Officer, defendant Jean-François Ott, the other named individual defendants, and even Vitek's own mother, defendant Milada Mala – and used that control to defraud Kingstown Capital.  To disguise their criminal agreement, Vitek and his co-conspirators went to ridiculous lengths, including staging screaming arguments at board meetings or during business lunches to make it appear that they were in disagreement, only to turn around and act in concert for Vitek's personal enrichment.  Among other things, Vitek stripped ORCO of its most valuable real estate

assets, using his effective control over the company to cause ORCO to sell real estate at distressed prices to other entities that Vitek secretly controlled.

3.      Plaintiff Investhold Ltd and its affiliates were another business partner of Vitek. Investhold's majority shareholder, Czech businessman Marek Cmejla, started doing business with Vitek in or about 2008.  In or about late 2012, Investhold agreed to a general partnership with Vitek in which Investhold and Vitek would share business opportunities and split the profits equally, with Investhold generally providing the operating capital and Vitek generally providing the operational knowledge in the real estate industry.  Quickly, however, Vitek realized that operational control over the partnership's investments gave him the ability to cheat Investhold: Vitek would use Investhold's money, but then would use his control to strip out the most valuable assets from the partnership for his own personal enrichment.

4.      Vitek's scheme, which was carried out for nearly a decade and involved numerous investments and entities, was made possible by J&T Banka, a.s., and its affiliates. J&T Banka, a small but significant privately-owned Czech bank, financed nearly every one of Vitek's fraudulent schemes, and was a willing participant in Vitek's crimes.  Indeed, J&T Banka not only structured hundreds of millions of dollars in debt for Vitek – in contravention of numerous Czech and European banking requirements – but it also assisted in the formation and administration of the shell companies he used to perpetrate his scheme, and in some cases J&T employees and professionals served as nominee directors and shareholders for those shell companies.

5.      Although Vitek and his confederates perpetrated their scheme from the Czech Republic and elsewhere in Europe, they reached deliberately and repeatedly into the United States, and New York in particular, to perpetrate their crimes.  Among other things, Vitek and his

co-conspirators placed telephone calls in furtherance of their scheme to New York; sent written communications by mail and electronic mail to persons in New York in furtherance of their scheme; caused individuals to travel from New York to Europe and, in Ott's case, travelled from Europe to New York, all in furtherance of their scheme; solicited U.S. dollar denominated investments from New York; and defrauded Kingstown Capital – a New York-based investment advisor.

6.      As a result of the nearly decade-long scheme perpetrated by Vitek and his co-conspirators, Vitek stripped over a billion dollars of real estate assets from the businesses he ran and misappropriated them for his personal benefit.

7.      These are not mere allegations.  In 2017, the Luxembourg financial regulator known as the Commission de Surveillance du Secteur Financier ("CSSF") launched an investigation of Vitek, Ott, and CPI Property Group S.A. (then known as ORCO Germany) and found that Vitek and Ott had "acted in covert concert," secretly controlled ORCO, and therefore violated Luxembourg and European law.

## THE PARTIES

### The Plaintiffs

8.      Kingstown Capital Management L.P. is a limited partnership formed under the laws of Delaware, with its principal place of business in the Southern District of New York. Kingstown Capital Management L.P. is registered as an investment adviser with the U.S. Securities and Exchange Commission, with more than $1.4 billion in assets under management. It was founded in or about 2006, and since that time has invested in credit and equity of all kinds, including real estate and real estate-related securities.

9.     Kingstown Partners Master Ltd. is an exempted investment company, incorporated under the laws of the Cayman Islands, with its principal place of business in the Southern District of New York.

10.     Kingstown Partners II, L.P. is a limited partnership formed under the laws of Delaware, with its principal place of business in the Southern District of New York.  Plaintiff Kingstown Capital Management L.P. serves as the investment manager for Kingstown Partners II, L.P., and plaintiff Kingstown Capital Partners LLC serves as its general partner.

11.     Ktown, LP is a limited partnership formed under the laws of Delaware, with its principal place of business in the Southern District of New York.  Plaintiff Kingstown Capital Management L.P. serves as the investment manager for Ktown, LP, and plaintiff Kingstown Capital Partners LLC serves as its general partner.

12.     Kingstown Capital Partners LLC is a limited liability company organized under the laws of Delaware, with its principal place of business in the Southern District of New York. As set forth above, Kingstown Capital Partners LLC is the general partner of plaintiffs Kingstown Partners II, L.P., and Ktown, LP.

13.     Plaintiff Kingstown Capital Management L.P. serves as the investment manager for plaintiffs Kingstown Partners Master Ltd., Kingstown Partners II, L.P., Ktown, LP, and Kingstown Capital Partners LLC, as well as other private funds that are not plaintiffs in this action.  In this Complaint, Kingstown Capital Management L.P., Kingstown Partners Master Ltd., Kingstown Partners II, L.P., Ktown, KP, and Kingstown Capital Partners LLC are collectively referred to as "Kingstown Capital."

14.     Kingstown Capital clears its trades through a variety of prime brokers, all of whom are located in the Southern District of New York, and custodies its assets at a variety of financial institutions, all of whom are located in the Southern District of New York.

15.     Investhold Ltd is a holding company organized under the laws of the Republic of the Marshall Islands.  Investhold Ltd has ownership interests in a portfolio of companies, which are collectively referred to in this Complaint as the "Investhold Group" or simply "Investhold." The majority, controlling shareholder of Investhold Ltd. is Marek Cmejla, a citizen of the Czech Republic.  A minority stake in Investhold Ltd. is held by Jiri Divis, a citizen of the Czech Republic and Switzerland.

16.     Verali Limited ("Verali") was formed in or about 2008 under the laws of the Republic of Cyprus, with its headquarters in Nicosia, Cyprus.  Verali is a wholly-owned subsidiary of Investhold Ltd., and is part of the Investhold Group.

### The Defendants and their Affiliates

17.     Defendant Radovan Vitek, age 47, is a citizen of the Czech Republic, residing in the Czech Republic, Switzerland, the United Kingdom, and elsewhere.  Vitek is a lawyer by training, but has spent most of his adult life as a real estate investor and developer.  According to *Forbes* magazine, as of April 9, 2019, Vitek's net worth was approximately $3.5 billion, making him one of the 1,000 richest people in the world.  As set forth in this Complaint, however, Vitek's wealth is based in material part upon his fraud and other crimes against the Investhold Group, Kingstown Capital, and other victims who lost millions upon millions of dollars when Vitek misappropriated valuable assets from companies they owned.

18.     Defendant CPI Property Group, S.A. ("CPI PG") is a Société anonyme organized under the laws of Luxembourg, with its headquarters in Luxembourg, and with its shares listed

on the Frankfurt Stock Exchange.  As of December 30, 2018, according to information publicly provided by CPI PG, Vitek "indirectly" owns 91.61% of CPI PG, and controls 94.25% of the voting rights in the company.  Vitek also sits on the Board of Directors of CPI PG.  CPI PG owns and operates an approximately €7 billion real estate portfolio that includes residential, industrial, agricultural, and logistics properties, as well as hotels, across Europe, and has nearly 4,000 employees.  In its most recent annual report, CPI PG held itself out as "the largest owner of income-generating real estate in the Czech Republic, Berlin and the CEE [*i.e.*, Central and Eastern European] region."

19.     CPI PG was founded in 2004 as ORCO Germany S.A. ("ORCO Germany"), a subsidiary of ORCO Property Group, S.A., a Luxembourg-based real estate development company ("ORCO").  In or around June 2014, ORCO Germany and its subsidiary Gewerbesiedlungs-Gesellschaft ("GSG") were combined with Czech Property Investments, a.s. to create what is now known as CPI PG.

20.     In or around August 2016, the remainder of ORCO merged with and became a subsidiary of CPI PG.  As of September 30, 2018, CPI PG owned 97.31% of ORCO, and controlled 97.31% of the voting rights in the company.

21.     Defendant Milada Mala is a citizen of the Czech Republic, residing in the Czech Republic, and is Radovan Vitek's mother.  As set forth below, Mala often serves as an agent, proxy, or nominee for Vitek.  For example, Mala was the nominal owner of Vitek's shares in Czech Property Investments, a.s. (until she "donated" her stock to Vitek, who held it prior to the company's 2014 merger into CPI PG); Tandis, a.s. (a Czech company through which Vitek controlled shares in ORCO Germany, which was also later merger into CPI PG); and Sidoti, a.s.

(a company that acquired certain of ORCO's assets from J&T Bank, after Vitek and J&T Bank conspired to strip those assets out of ORCO at artificially depressed prices).

22.     Defendant Jean-François Ott, age 54, is a citizen of France, residing principally in Paris and Prague.  In or about 1991, Ott founded ORCO, and he was until in or about March 2014 the Chief Executive Officer and a member of the Board of Directors of ORCO and ORCO Germany (now known as CPI PG).

23.     Defendant J&T Banka, a.s. ("J&T Banka") is a Czech bank founded in 1998 that operates in several countries, including Slovakia and Cyprus, and is held by the J&T Group (as it is defined below) through its banking holding company, J&T Finance Group SE.  As set forth below, J&T Banka provided funding to Vitek, including through loans and by purchasing bonds issued by Czech Property Investments, a.s., and CPI PG.

24.     Defendant Postova Banka, a.s. ("Postova Banka") is a bank headquartered in the Slovak Republic. Postova Banka is a subsidiary of J&T Finance Group SE and an affiliate of defendant J&T Banka, and also provided financing to Vitek, as set forth below.

25.     J&T Group consists of the holding companies J&T Finance Group SE ("J&T Finance Group") and J&T Private Equity Group ("J&T Private Equity"), which each consist of a group of financial companies. The J&T Group is fully controlled by two Slovakian businessmen, Ivan Jakabovic and Patrik Tkac, who are close friends and business partners of Radovan Vitek. Jakabovic and Tkac began to build the J&T Group through business ventures with Radovan Vitek, including Penta and Istrokapital, two Slovakian companies.

26.     J&T Finance Group S.E. is a holding company headquartered in Prague. Since J&T Group's reorganization in December 2013, J&T Finance Group has held J&T Group's

banking assets, including defendants J&T Banka and Postova Banka, as well as J&T Banka's

Slovak affiliate, Russian bank J&T Banka Zao, and the Barbadian bank J&T Bank and Trust.

27.     J&T Private Equity is a holding company headquartered in the Republic of

Cyprus. Since J&T Group's reorganization in December 2013, J&T Private Equity has held J&T

Group's non-banking assets, including investments in energy, industry, real estate, and media. A

part of J&T Group's financing and support for Vitek's scheme was through companies held by

J&T Private Equity.

28.     Defendant Jan Gerner is a citizen of the Czech Republic, residing in the Czech

Republic.  Gerner was the nominal owner of Fetumar Development Limited ("Fetumar"), a

Cypriot shell company controlled by Radovan Vitek.  As alleged below, Fetumar was a holder of

in excess of 30% of the outstanding shares and voting rights in ORCO on Vitek's behalf until

ORCO's 2016 merger with CPI PG.

29.     Defendant Lumir Safranek is a citizen of the Czech Republic, residing in the

Czech Republic, and a close friend of Vitek.  Safranek was the nominal owner of Kamoro

Limited, a Cypriot shell company controlled by Vitek, and which Vitek used to disguise his

ownership in shares of ORCO Germany.

30.     Defendant Pavel Spanko is a citizen of the Czech Republic, residing in the Czech

Republic, and a close friend of Vitek.  Spanko was the nominal owner of Aspley Ventures

Limited ("Aspley"), a British Virgin Islands shell company controlled by Radovan Vitek.  As

alleged below, Aspley was a holder of in excess of 30% of the outstanding shares and voting

rights in ORCO on Vitek's behalf until ORCO's 2016 merger with CPI PG.  Spanko was also, at

certain relevant times, a member of the Board of Directors of ORCO.

31.     Defendant Julius Strapek is a citizen of the Czech Republic, residing in the Czech Republic.  Strapek was the nominal owner of Jagapa Limited ("Jagapa"), a Cypriot shell company controlled by Radovan Vitek.  As alleged below, Jagapa was a holder of in excess of 30% of the outstanding shares and voting rights in ORCO on Vitek's behalf until ORCO's 2016 merger with CPI PG.  Strapek was also, at certain relevant times, a member of the Board of Directors of J&T Banka.

## JURISDICTION AND VENUE

32.     This Court has subject matter jurisdiction over this action because it arises under the laws of the United States, pursuant to 28 U.S.C. § 1331.

33.     All other claims alleged in this Complaint are so related to the claims within the original jurisdiction of this Court such that they form part of the same case or controversy.  As a result, this Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1367.

34.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391(a)(2), because a substantial part of the events or omissions giving rise to the action occurred in the Southern District of New York.

## FACTUAL ALLEGATIONS

**I.      The Rise of Radovan Vitek's Real Estate Empire**

35.     According to public sources, Vitek first became wealthy in the mid-1990s, as a result of Slovakia's voucher privatization, in which citizens were given the opportunity to inexpensively acquire shares in formerly state-owned companies.

36.     At about the same time, Vitek became an investor in Istrokapitál, a Slovak financial group founded in 1996 that was later described by the *Times* of London as "a conduit for 'Russian money' and a front for money laundering. In written evidence to the [U.K.] Foreign Affairs Select Committee [in 2008], Istrokapitál was described as having the 'strongest ties to the

underworld and is known to draw its muscle from former officers of the Slovak intelligence service.'"[1]

37.      Vitek moved to the Czech Republic in or about 1997 and began investing in and developing real estate projects, including a Czech luxury hotel.  For approximately the next ten years, Vitek continued to try to expand his real estate business, but, upon information and belief, his success was limited by his relative lack of access to capital.

38.      Marek Cmejla, a citizen and native of the Czech Republic, is a successful businessman and the majority owner of the Investhold Group.  In or about 2007, Mr. Cmejla was introduced to Vitek, who inquired about becoming "business partners."  Specifically, Vitek wanted access to Mr. Cmejla's money, as Vitek was having trouble raising capital for his own real estate projects.

39.      At the time, Vitek owned a holding company called TP Development Trust Limited, which in turn owned several entities that themselves held real estate.

40.      In or about 2008, Mr. Cmejla created plaintiff Verali for the purpose of purchasing equity in four entities owned by TP Development Trust Limited (the "Four Companies").  Mr. Cmejla paid 700 million Czech koruna (approximately $41.3 million) to TP Development Trust Limited in return for a 50% interest in each of the Four Companies.

41.      In addition to having equal equity stakes in the Four Companies, Investhold Group (through Verali) and Vitek (through TP Development Trust Limited) agreed they would both be represented on the board of directors of each of the Four Companies and that no major action could be effected without the unanimous consent of the directors of each board.

---

[1]      Robert Smith, *Property Developer Mario Hoffman Said He "Owned" Turks and Caicos Government*, Feb. 13, 2009, Times (London), https://www.thetimes.co.uk/article/ property-developer-mario-hoffman-said-he-owned-turks-and-caicos-government-92x7kkp6jbl

42.     After Verali acquired its 50% stake in the Four Companies, Mr. Cmejla and Vitek, as well as their respective representatives and employees, met on a regular basis.  Mr. Cmejla believed that Vitek was working cooperatively with the Investhold Group, and that their interests were aligned, in relation to the Four Companies.  Vitek also purported to consult with Mr. Cmejla regarding significant business decisions related to the Four Companies, and Mr. Cmejla was led to believe that Vitek did not undertake any material business decisions without Mr. Cmejla's knowledge and consent.

43.     As a result, Mr. Cmejla considered the joint investment between the Investhold Group and Vitek to be a success.  Mr. Cmejla in fact believed that Vitek was his friend, and that the two would broaden what Mr. Cmejla believed was a successful partnership.

44.     Between 2008 and 2010, Vitek invited Mr. Cmejla to partner on other investments on similar terms.  In general, Vitek would identify potential investments and then go to Mr. Cmejla to provide the financing through various entities affiliated with the Investhold Group. The Investhold Group would get a 50% interest in these projects, and Vitek would get the other half in exchange for managing the projects (ostensibly in consultation with Mr. Cmejla and the Investhold Group).

45.     In 2009 and 2010, along with the rest of the world, the Czech Republic experienced a real estate crisis. Residential and commercial real estate prices fell substantially, and commercial financing through the capital markets was hard to come by and very expensive.

46.     Vitek saw the crisis as an opportunity.  Vitek sought capital so that he could purchase properties at distressed prices, complete real estate development projects that were already underway, and leverage other investors' need for liquidity to buy them out of existing

projects at lower valuations.  Vitek looked to Marek Cmejla and his Investhold Group for much of this capital, which the Investhold Group provided on substantially similar terms as before.

47.     In or about 2010, Vitek suggested that he and Marek Cmejla enter into what Vitek called a "parity partnership."  Over the next year, Vitek and Mr. Cmejla executed a series of agreements pursuant to which they would split all profits or losses, and equity value, across a broad portfolio of investments.  Under this "parity partnership," Vitek and Mr. Cmejla also agreed to effectively give one another a right of first refusal with respect to future investments. That is, Vitek promised to give Mr. Cmejla the opportunity to invest in every project he was considering, to ensure that particularly valuable investments did not evade the partnership.

48.     Ultimately, the so-called "parity partnership" was effected when the Investhold Group invested in Czech Property Investments, a.s.  At the time, as set forth above, Czech Property Investments, a.s. was nominally owned by defendant Milada Mala, Vitek's mother. Notwithstanding Mala's nominal ownership of Czech Property Investments, a.s., Vitek exercised complete control over the company and made all substantial business decisions on its behalf.

49.     As a result of capital investments by the Investhold Group, the value of Czech Property Investments, a.s. doubled.  Consistent with the "parity partnership," in return for its investment, Investhold Group (through Verali) received a right to a 50% stake in Czech Property Investments, a.s., as well as the other terms and conditions that had characterized their previous business dealings.

50.     For example, as with all their previous joint investments, Mr. Cmejla named a director to represent Investhold Group on Czech Property Investments, a.s.'s board, and no board action could be approved without the agreement of Investhold Group's board representative. The right to name a Czech Property Investments, a.s. board representative ensured that the

Investhold Group would have visibility into and knowledge about any major business decision confronting Czech Property Investments, a.s., and that no major decision or action could be carried out without Investhold Group's knowledge and consent.

51. Despite the seeming success of the "parity partnership," Vitek did not actually keep the Investhold Group fully informed as to significant business decisions. Among other things, Vitek failed to provide the Investhold Group the opportunity to invest in certain real estate projects, which Vitek pursued outside of the "parity partnership," and contrary to its terms. In addition, Vitek engaged in fraud and other criminal activities to further his own business interests.

## II. Vitek Expands His Real Estate Empire Through Fraud, Money Laundering, And Other Crimes

### A. Jean-Francois Ott Induces Kingstown Capital to Invest in ORCO

52. As set forth above, defendant Jean-François Ott founded ORCO in or about 1991, and was until in or about 2014 its Chief Executive Officer and a member of the Board of Directors. Over time, Ott's interest in ORCO made him a multi-millionaire.

53. Until the 2009-2010 Czech real estate crisis, ORCO flourished. When credit conditions tightened and its assets generated less and less cash, however, ORCO faced large debts that it could no longer afford to service.

54. Ott, for his part, had grown accustomed to the wealth his former success had allowed him to enjoy, and as the value of ORCO collapsed amidst the Czech real estate crisis, Ott was focused on restructuring ORCO's debt and identifying potential new investors who could inject capital into ORCO while letting Ott retain his position as CEO and his equity stake in the company.

13

55.    In or about 2011, Kingstown Capital identified ORCO as a promising target for investment.  At the time, ORCO was going through a bankruptcy proceeding.  ORCO was the type of investment that Kingstown Capital favors:  a financially distressed business with a solid slate of cash-generating assets that would be profitable once the company restructured its debts and received fresh working capital.

56.    In advance of a potential investment into ORCO, Kingstown Capital conducted due diligence – the process through which an investor assesses a potential investment target.  As part of the due diligence, representatives of Kingstown Capital – located in Manhattan, New York – frequently spoke over the telephone with and e-mailed with Ott.  Ott also travelled to the United States to meet with representatives of Kingstown Capital on at least three occasions.  On each occasion, Ott met with Kingstown Capital representatives at Kingstown Capital's offices in Manhattan, New York.  On at least the first such visit, Ott stated that he was also meeting with other potential investors in the United States, to market ORCO's debt.  Among other things, in at least one of these in-person meetings, Ott discussed with Kingstown Capital's representatives ORCO's debt structure and assets in great detail.

57.    Kingston Capital determined that the information that it was provided during the due diligence was verifiable and accurate (and has never learned any information to the contrary), and on that basis Kingstown Capital decided to purchase ORCO's corporate bonds in anticipation of a restructuring transaction.  As part of negotiating the terms of the transaction, Kingstown Capital representatives met with Ott, other members of ORCO's management, and existing bondholders of both ORCO and its subsidiary, ORCO Germany.  Kingstown Capital invested significant resources, including both time and money, into developing a plan to restructure ORCO, which it executed from its headquarters in New York.

14

58.     On or about September 4, 2012, Kingstown Capital wired U.S. dollar denominated funds from its accounts in the United States to invest in ORCO's bonds.  The transaction was cleared through a broker in the Southern District of New York, and Kingstown Capital custodied its bonds with a financial institution located in the Southern District of New York.

59.     Ott knew that Kingstown Capital's investment in ORCO would originate from an account at a U.S. bank, and be made in U.S. dollars.

60.     As a result of its investment in ORCO and the subsequent restructuring transactions, Kingstown Capital became one of the largest shareholders of ORCO.  As of mid-2013, Kingstown Capital held a 12.52% stake in ORCO.

**B.      Vitek Devises a Scheme to Acquire Control of ORCO And Then Loot It Of Its Most Valuable Assets**

61.     After Kingstown Capital had completed its due diligence and made its initial investment in ORCO, Vitek set out to devise a scheme to loot ORCO of its most valuable assets and to dilute ORCO's investors until he (directly and through affiliates he owned or controlled) owned ORCO by himself.

62.     Vitek's fraudulent scheme involved two steps, as set forth in greater detail below. First, Vitek secretly acquired a controlling interest in ORCO, in violation of the European "Takeover Bids Act," by paying or otherwise inducing nominees to purchase shares on Vitek's behalf and then vote the shares as Vitek directed.  Second, having taken effective control of ORCO, Vitek caused ORCO to sell its most valuable assets (consisting primarily of real estate) to his associates and co-conspirators at below-market prices.

15

63.      In order to raise the funds needed to execute this scheme – both to finance the acquisition of ORCO shares, and then to purchase ORCO assets – in or about early 2012, Vitek struck a deal with J&T Group to have J&T Banka act as a purported arms-length lender and finance his illicit takeover of ORCO.  Vitek and certain J&T Group executives had an ongoing personal relationship, and Vitek's companies banked with J&T Group.

64.      In order to facilitate Vitek's scheme, J&T Banka provided Vitek both "official" and "unofficial" financing.  J&T Banka's "official" financing was secured by Vitek's assets – such as under a Promissory Note Program between J&T Banka and Czech Property Investment, a.s. – while its "unofficial" portion was subject to separate, secret, side deals between Vitek and the J&T Group.  J&T Group structured its financing of Vitek's fraudulent scheme in order to evade Czech and European banking laws, including a limit imposed by Czech law on the maximum amount of financing that a bank may provide to an individual borrower.

65.      J&T Group actively concealed its affiliation with Vitek, by serving as broker for significant transactions involving ORCO assets, and perhaps most significantly by providing shell companies to serve as straw purchasers for those assets whenever Vitek required.  For example, J&T Group conspired with Vitek to provide bank loans in the amount of €29.6 million each to Fetumar Development Limited and Aspley Ventures Limited – companies that J&T Group knew were secretly controlled by Vitek – in order to ensure sufficient capital to acquire ORCO shares during ORCO's November 2014 capital increase.  J&T Group again funded a company secretly controlled by Vitek, Jagapa Limited, in order to subscribe shares in ORCO in May 2016.  As explained further below, J&T Group profited from the scheme by loaning money to Vitek at very high interest rates.

66.     Under the Takeover Bids Act – Directive 2004/25/EC of the European Parliament and of the Council of 21 April 2004 on takeover bids – any person or entity that acquires control of more than 33.33% of a company must offer to purchase all other outstanding shares. For purposes of the Act as relevant here, shareholders' stakes are aggregated with the stakes of everyone with whom they are acting in concert to acquire ownership interest in a company.

67.     Vitek's scheme involved effectively taking over ORCO.  But Vitek did not want to openly surpass the threshold for a compulsory acquisition offer under the Takeover Bids Act by purchasing too much of ORCO in his own name or companies associated with him.  In order to continue acquiring ORCO shares and take over its Board of Directors while disguising his ownership, Vitek (using funds acquired from J&T Banka) financed straw owners to acquire and hold ORCO shares and then to vote those shares on his behalf.  Later, having gained control of ORCO's Board of Directors, Vitek caused ORCO to sell its most valuable assets to other shell companies that he controlled, for below-market prices.

68.     Upon information and belief, the first set of valuable assets that Vitek targeted were certain real estate funds managed by ORCO, known collectively as the Endurance Real Estate Fund.

69.     The Endurance Real Estate Fund was a privately owned closed end property fund founded by ORCO in 2005 for investing in Central and Eastern European real estate. The Endurance Real Estate Fund is organized as an umbrella fund with three sub-funds: the Office Sub-fund, the Office II Sub-fund, and the Residential Sub-fund.  As of 2012, ORCO maintained a minority interest in each of these sub-funds; the rest of the unitholders were unaffiliated investors, including major financial institutions.

17

70.      In mid-2012, Vitek began to spread misinformation regarding the financial health of these funds. Vitek's misinformation campaign was directed primarily at Deutsche Pfandbriefbank, AG ("Deutsche PBB"), a German bank specializing in real estate and public sector financing, which provided most of the Endurance Fund's financing.

71.      In the months leading up to September 2012, Vitek spread misinformation about the long-term economic viability of the sub-funds managed by the Endurance Real Estate Fund in hopes of depressing the price of these assets, and to later provide a pretext for the sale of ORCO's interest in the two Endurance Office Sub-funds at distressed prices.  Articles appeared in on-line media outlets such as *Bloomberg* and *Patria* questioning whether the fund had the ability to service its bank debt.  At the same time, Vitek caused the value of the Endurance Fund's assets to be lowered on its own books, making it appear as if the Endurance Fund's assets were worth less than their true value.

72.      Vitek's misinformation campaign worked. Upon learning of Vitek's false reports in mid-to-late 2012, Deutsche PBB began to call in its loans to the two Endurance Office sub-funds, and ceased to make new financing arrangements. Further, as a result of Vitek's misinformation campaign, the Endurance Office sub-funds had difficulty securing new financing from other lenders to refinance the loans that Deutsche PBB had called.

73.     By in or about September 2012, Vitek's false claims that the Endurance Fund's Sub-funds were in financial trouble had become a self-fulfilling prophecy.  As the sub-funds were unable to find financing for their operations – as a direct result of Vitek's misinformation campaign, and not at all due to any problems with the sub-funds' underlying assets – they came under true distress.  By the time the Endurance Office Sub-funds released financial statements for the quarter ending September 2012, their auditors reported that they had concerns about the sub-funds' ability to sustain operations.

74.     In or about December 2012, with the value of sub-funds managed by the Endurance Real Estate Fund depressed due to earlier negative reports by their auditors based on the misinformation spread by Vitek and his agents, Vitek arranged for J&T Banka to purchase, for his benefit, a 31.2% interest in the Office Sub-fund from four outside investors unaffiliated with ORCO.

75.     As discussed below, Vitek intended to use the artificially depressed transaction price for this acquisition as a benchmark for his contemplated purchase of ORCO's interest in the Office Sub-fund.  In fact, the sale by the Endurance Fund's fund manager (*i.e.*, ORCO) of such a substantial stake in the Endurance Fund caused a panic amongst other investors, who began selling off their stakes at discounts reaching 50% of the Endurance Fund's already artificially-depressed valuation.  The Plaintiffs did not own shares in Endurance Fund and were not among the selling shareholders.  The exclusive buyer of these interests was J&T Banka. Within a period of months, as discussed further below, J&T Bank was the owner of nearly 75% of the Endurance Fund's assets; the only other stakeholders were three Danish funds – who understood the true value of the assets – that had declined to sell.

C.  **ORCO Is Restructured and Reorganized with the Help of Its New Investors, and Vitek Attempts to Use the Restructuring To Take Control of the Company**

76.     After Kingstown Capital and other investors had established equity stakes in ORCO, and ORCO restructured its debt so that it could recover from the real estate crisis, Vitek proceeded to strip ORCO of its most valuable assets – its real estate holdings – and fraudulently misappropriated them for his own benefit.

77.     As part of the restructuring plan, in or about September 2012, ORCO's existing corporate bonds were converted to equity.  Other shareholders in ORCO following this conversion included at least three U.S.-based investment firms: Capstone Equities Capital Management, Tricadia Capital Management, LLC, and J.P. Morgan.

78.     At or about the same time, Kingstown Capital and a U.K.-based fund called Alchemy Special Opportunities LLP ("Alchemy"), another former bondholder-turned-shareholder, extended fresh working capital loans to ORCO.  This manageable amount of debt was designed to allow ORCO to fund its ongoing operations and make profitable use of its assets.

79.     Also as part of the reorganization, ORCO's Board of Directors was to be reconstituted to provide representation to ORCO's new major shareholders, Kingstown Capital and Alchemy.  However, there was a gap of several months between the time when Kingstown Capital and Alchemy converted their bonds to equity, and the time when the new Directors were to be elected and installed.  In that interim period, Vitek worked furiously to ensure he could continue to improperly use ORCO assets for his personal benefit in light of the impending change in Board composition.

80.     Upon information and belief, not long after the ORCO bonds converted to equity, Vitek began using the financing from J&T Group to purchase shares of ORCO through two shell

companies beneficially owned by him: Gamala Limited (a Cypriot company) and Crestline
Ventures (a BVI company).  Gamala Limited and Crestline Ventures provided notice that they
had together acquired a 20.69% stake in ORCO.  On or about October 19, 2012, ORCO issued a
press release disclosing Gamala and Crestline's stake. Although Vitek was in fact the beneficial
owner of both Gamala Limited and Crestline Ventures, his ownership of these entities – and
therefore his ownership of a material stake in ORCO – remained hidden from ORCO's other
shareholders, including Kingstown Capital.

81.     Without disclosing his ownership interest in ORCO, Vitek attempted to use
Kingstown Capital to secretly acquire a controlling stake in ORCO.  Kingstown Capital and
Alchemy received a proposal from one of Vitek's employees at Czech Property Investments, a.s.,
named Martin Nemecek.  Nemecek conveyed that Czech Property Investments, a.s. intended to
acquire up to 30% of the ORCO shares and proposed that Kingstown Capital and Alchemy team
up with Vitek to "see the company operating well."  Nemecek proposed that Vitek would
provide the real estate industry expertise, and therefore should have the ability to nominate
Kingstown Capital and Alchemy's designated Board of Directors representatives.  Nemecek
failed to disclose, however, that Vitek already had a 20.69% stake in the company, and that his
proposal would have involved an effective take-over of the company and its Board by Vitek.
(Nemecek, a close Vitek associate, is currently the CEO of CPI PG).

82.     On November 2, 2012, Vitek disclosed to ORCO that he was the sole beneficial
owner of Gamala Limited and Crestline Ventures.  And On November 7, 2012, ORCO issued a
press release disclosing that Vitek was the beneficial owner of these entities and thus controlled
20.69% of ORCO.  This was the first time that ORCO's other investors, including Kingstown
Capital, learned of Vitek's interest in ORCO.

21

83.     Ultimately, both Kingstown Capital and Alchemy rejected Vitek's proposal, at least in part because they objected to allowing Vitek to select a disproportionate number of non-management directors on the Board, conscious that that could bring Vitek closer to gaining control of the company.  Instead, Kingstown Capital and Alchemy proposed a more equitably divided Board of Directors, and further proposed raising fresh capital by selling new ORCO shares under terms that would allow existing shareholders (such as Kingstown Capital and Alchemy themselves) to participate in proportion to their stake and thereby avoid being diluted.

### D.     Vitek Partners with Ott to Control ORCO and Continue Looting Its Assets After the Restructuring

84.     Vitek rejected Kingstown Capital and Alchemy's proposal for an equitably divided board and new capital, which would have prevented him from exerting total control over ORCO.  Instead, as described below, Vitek conspired with Ott to secretly take control of ORCO and execute his scheme to strip ORCO of its valuable assets.

85.     Prior to ORCO's restructuring, Ott was a major shareholder.  When ORCO went through its bankruptcy and then converted its bond debt to equity, virtually all of Ott's equity was wiped out.  After the restructuring, Ott was given less than 1% of ORCO's equity in consideration for his role as a key executive.  Although Ott had been eager for Kingstown Capital and Alchemy to provide ORCO with necessary working capital, Ott was also aware that there was little he could do to stop these new shareholders from replacing him as CEO without a powerful investor's support.

86.     Upon information and belief, Ott agreed to help Vitek execute his fraudulent scheme because Vitek offered to keep him as ORCO's CEO and implied that he would help Ott regain his former wealth.  (As set forth in greater detail below, among other things, Vitek

22

ultimately agreed to cause ORCO to make a payment to Ott valued at €16 million in cash and real estate.)

87.      Ott helped Vitek by acting on his behalf, and by recruiting other ORCO executives and directors to help Vitek.  For example, upon information and belief, Ott agreed to pressure Nicholas Tommasini and Guy Wallier to further Vitek's scheme.  Tommasini was ORCO's Chief Operating Officer, Deputy CEO, and a member of ORCO's Board.  Wallier was an outside, independent ORCO Board member, although he maintained a decades-long friendship with, and was an early mentor of, Ott.

88.      Ott agreed to keep his illicit agreement with Vitek a secret.  He also agreed to participate in a ruse to convince Kingstown Capital and Alchemy that Ott was aligned with them in opposition to Vitek.  By agreeing to secretly work with Vitek, on the one hand, and by pretending to align himself with Kingstown Capital and Alchemy, on the other, Ott was effectively a "double agent," ensuring that no major shareholder would seek to remove him from management.

89.      To further his scheme in the absence of Kingstown Capital and Alchemy's cooperation, Vitek determined to boost his ownership and influence in ORCO, both directly and indirectly.

90.      Accordingly, on or about November 22, 2012, entities beneficially owned by Vitek acquired additional shares in ORCO, and sent the required notification to ORCO.  On or about November 23, 2012, ORCO issued a press release announcing that Vitek beneficially owned shares representing 29.65% of ORCO's total share capital and voting rights.

91.      On or about December 31, 2012, Vitek sent a letter to the ORCO Board of Directors proposing a number of shareholder resolutions and formally requesting a general

23

meeting of ORCO shareholders be scheduled as soon as possible; at the shareholder meeting, Vitek wanted votes on his proposed resolutions as well as the composition of the ORCO Board. In his letter to the ORCO board, Vitek also nominated himself and two of his employees, Martin Nemecek and Jiri Dedera, to serve as ORCO Directors.

92.     The shareholder resolutions proposed by Vitek were designed to enable him to take control of the company.  They would have: (1) lowered the accounting par value of ORCO's shares from €4.10 to €2.00 per share; (2) granted the ORCO Board authority to issue and sell a large number of new shares; and (3) allowed management to sell any newly issued shares at any price above €2.00 to specific persons or entities without offering existing shareholders the opportunity to participate consistent with their pro rata holdings.

93.     The net effect of Vitek's proposal, were it approved, would be to allow ORCO to issue a large number of new shares (equal to approximately 20% of the then-outstanding number), which could have been sold at below market prices to individuals and entities associated with Vitek, diluting other shareholders such as Kingstown Capital and without giving them the right to participate in the offering.  In this way, the proposals were designed to allow Vitek to assert even greater control over ORCO, on the cheap.

94.     Under Luxembourg corporate law, these resolutions needed to be approved by two-thirds of ORCO's shareholders because the proposals would have allowed ORCO to issue new shares on a preferential basis to certain third parties, thereby diluting existing shareholders.

95.     In an attempt to ensure the success of his shareholder resolution without openly crossing the 33.33% threshold under the Takeover Bids Act, Vitek secured funds through arrangements with J&T Banka and Postova Banka to secretly purchase additional shares in ORCO.

96.     On or about January 10 and 11, 2013, Vitek purchased over nine million additional shares in ORCO at €2.95 per share, for a total price of €26.8 million (approximately $35.6 million).  Although Vitek controlled and beneficially owned these shares, they were nominally acquired by a shell company called Stationway Properties Limited ("Stationway"), which made the purchase using funds deposited at J&T Banka.

97.     Although Stationway was owned by Ott, Stationway's purchase of ORCO's shares was negotiated by Vitek and his agents, not by Ott, consistent with Vitek's beneficial ownership of the shares.  As part of their secret agreement, Ott agreed to vote Stationway's shares at Vitek's direction.

98.     Stationway's January 10 and 11 purchases of ORCO shares occurred just days prior to January 23, 2013, the record date used to establish which shareholders would be eligible to vote at the next general meeting of ORCO shareholders.  That is, Vitek (through Stationway) acquired nine million additional ORCO shares just ahead of the vote on his shareholder resolution, and in an attempt to ensure its success, as well as the success of Vitek's nominees to the Board of Directors.

99.     In this way, Vitek attempted to acquire enough of a voting interest in ORCO to bypass Kingstown Capital and Alchemy's opposition to his shareholder proposal, and secure both disproportionate board representation and approval for his proposed shareholder resolutions.

100.    When the Stationway shares were purchased on or about January 10 and 11, 2013, Vitek was already the largest single shareholder in ORCO, officially holding almost a 30% stake in the company.  As of January 2013, Vitek – between his own entities and Ott's Stationway – secretly controlled almost 40% of ORCO.

101.    By controlling over 40% of ORCO, Vitek had sufficient voting power to block any action requiring at least two-thirds shareholder vote, including a proposal by Kingstown Capital and Alchemy to recapitalize ORCO by issuing further shares in an offering open to all shareholders.

102.    Because they were working in concert, Vitek and Ott's aggregate interest in ORCO was also beyond the 33.3% threshold under the Takeover Bids Act to trigger a compulsory acquisition offer.  Therefore, as of no later than January 2013, Vitek and Ott were legally required to make an acquisition offer to other ORCO shareholders and, by failing to do so, were in continual violation of the Takeover Bids Act.  Vitek and Ott, however, hid and failed to disclose their coordination and did not make any such offer in January 2013, or at any other time.

103.    Had Vitek made a compulsory takeover offer when his effective interest in ORCO first surpassed one-third, he would have had to acquire the whole company at a market price, and thereby acquired ORCO's valuable assets at their true price.  By instead purchasing a controlling interest in secret and skirting the law requiring him to make a tender offer, Vitek was able to siphon off ORCO's most valuable assets at below-market prices without having to buy the entire company.

104.    In fact, Vitek could not have afforded to buy out all shareholders in the event of a compulsory acquisition offer.  By acquiring his interest in secret, Vitek was therefore not just able to continue to loot ORCO's assets for his personal benefit, he also avoided the financial ruin he would have faced if he were forced to comply with the Takeover Bids Act.

105.    Shortly after Stationway's purchase of ORCO shares, Ott called Kingstown Capital's representative in New York City to brag about the purchase.  Ott falsely represented to

Kingstown Capital that Ott used his own money to purchase the ORCO shares held by Stationway, and – consistent with his role as "double agent" – told Kingstown Capital's representative that he had purchased the shares out of a sense of "moral duty" to fend off Vitek from controlling ORCO.

106.    These statements were false and intended to deceive Kingstown Capital in at least three ways.  First, Vitek had purchased these ORCO shares with funds he, not Ott, secured from J&T Banka.  Second, even though the shares were being held by an entity that Ott technically owned, Vitek exercised control over how the shares would be voted.  Third, Ott was collaborating with Vitek, not working to resist his takeover of ORCO.  Had Kingstown Capital known that Ott was working with Vitek, Kingstown Capital would have sought to replace Ott and the other officers of ORCO.

107.    Ott's purchase of the ORCO shares made little sense, as well.  If Ott had the desire and access to capital to purchase so many ORCO shares, he could have done so as part of the restructuring at a far lower price.  Accordingly, on the same call, Kingstown Capital's representative confronted Ott, asking direct questions regarding his source of funds for the purchase. Ott again falsely claimed that he had used his own funds to purchase the shares.

E.    **Vitek Directs Ott to Secure Board Approval to Sell ORCO's Assets at Deflated Prices to Entities Controlled by Vitek**

108.    Before the 2013 shareholder meeting – at which Kingstown Capital and Alchemy's representatives might be elected to ORCO's Board – Vitek directed Ott to secure the approval of board resolutions authorizing management to dispose of ORCO's major assets, including its interests in Endurance's sub-funds.

109.    At the time, ORCO's Board of Directors consisted of Ott and Tommasini from ORCO management, as well as independent directors Wallier, Alexis Juan, Bernard Kleiner, and

David Ummels.  Ott used his influence over the board, including the cooperation of Tommasini and Wallier in Vitek's scheme as described above, to secure approval of Vitek's board resolutions at a January 25, 2013 board meeting.  According to the minutes later circulated by Tommasini, Vitek's resolution was adopted in part by unanimous vote.

110.    Ummels, representing a very minor ORCO shareholder, opposed the portions of the board resolution that would have authorized ORCO management to start selling interests in ORCO Germany, a valuable subsidiary.

111.    Knowing that it would pass with four votes, Ott instructed Wallier to vote with Ummels on one part of the shareholder authorization. Wallier's vote in partial opposition to Vitek's proposed board resolution was reflected in the minutes that Tommasini later circulated to ORCO's new Board, and therefore furthered the ruse that Wallier was an independent director.

112.    On January 29, 2013, the ORCO Board of Directors held another meeting. According to the minutes of this second January 2013 meeting (later circulated to the new ORCO Board by Tommasini), the Board unanimously approved the sale of ORCO's interests in the sub-funds managed by the Endurance Real Estate Fund at the same price at which J&T Banka had purchased other investors' stakes in the sub-funds.  That is, Vitek had succeeding in using the initial purchase of stakes in the sub-funds at depressed prices as a benchmark for acquiring ORCO's stake.  These prices reflected fraudulent misinformation spread by Vitek and his agents regarding the Endurance sub-funds.

**F.    Vitek and Ott Continue to Deceive Kingstown Capital, and Vitek Unsuccessfully Attempts to Take Over the Restructured ORCO at the February 2013 Shareholder Meeting**

113.    Just before the February 2013 ORCO shareholder meeting, Ott again travelled to New York City and, at Vitek's direction, met with Kingstown Capital's representative.

28

114.    At this meeting, Ott presented himself as a neutral broker trying to devise a compromise between Vitek and Kingstown Capital, who had competing shareholder proposals relating to the issuance of new ORCO stock up for a vote at the February meeting. In reality, however, Ott was acting as Vitek's agent.

115.    During his meeting with Kingstown Capital, Ott encouraged Kingstown Capital to support Vitek's efforts to secure greater board representation, and to raise funds through an issuance of ORCO shares on terms that would permit dilution of minor shareholders. Ott insisted that these measures would not result in Vitek's control of ORCO, which he pretended to oppose.

116.    Following their meeting in New York City, Ott continued to be in contact with Kingstown Capital's representative in New York City.  Each time Ott communicated with Kingstown Capital, he falsely represented that he did not want Vitek to have control of ORCO. In fact, Ott was working with Vitek to further Vitek's fraudulent scheme, including by holding nine million ORCO shares on Vitek's behalf through his shell company, Stationway.  Ott actively misled Kingstown Capital by concealing his conspiracy with Vitek.

117.    On or about February 4, 2013, ORCO convened a general meeting of its shareholders to first vote on shareholder proposals and then elect a new board.

118.    Ultimately, Vitek's shareholder resolution (with one exception) failed in the face of opposition from Kingstown Capital and Alchemy.  Had Vitek's resolutions passed, Vitek could have used his secret control over ORCO's Board of Directors to unilaterally issue new shares to himself and to entities that were secretly under his control for as little as €2.00 per share, while bypassing shareholders' protections against dilution.

119.    Instead, only Vitek's resolution to lower the accounting par value of ORCO's shares to €2.00 per share passed.  Without resolutions authorizing the issuance of new shares and

the suppression of shareholders' preferential subscription rights, the lower price did little to further Vitek's scheme.

120.     Immediately following the vote on shareholder resolutions, the new ORCO Board was elected.  The new ORCO Board of Directors consisted of the Kingstown representative; two representatives of Alchemy; Vitek and two of Vitek's employees, Nemecek and Jiri Dedera; Ott and Tommasini (from ORCO management); and three supposedly independent directors, Wallier, Alexis Juan, and Bernard Kleiner.

121.     Vitek officially controlled only three board seats: the ones held by himself, Nemecek, and Dedera. But unbeknownst to Kingstown Capital, Vitek had entered into a fraudulent conspiracy with several other directors, including Ott and, through Ott, Tommasini and Wallier.  Vitek therefore effectively controlled six votes on ORCO's eleven-member board, meaning that he could direct the outcome of any major decision of the company that did not require a shareholder vote.

122.     Further, as noted above, Vitek's covert control of about 40% of ORCO's shares gave him a veto over any action requiring a two-thirds shareholder vote. Therefore, Vitek was able to block any attempt by Kingstown Capital and Alchemy to recapitalize ORCO by issuing equity in an offering available to all shareholders.

123.     In this way, Vitek was able to prevent ORCO from receiving additional capital to finance its operations through share issuances, which in turn helped him justify proposals to raise capital by selling ORCO's assets. Because such proposals only required board approval and Vitek controlled a majority of the board, Vitek could cause ORCO to sell its valuable assets at below-market prices, allowing Vitek to misappropriate ORCO assets without the need to dilute Kingstown Capital and the other shareholders who opposed his control.

G.     **Vitek and Ott Complete the Looting of an ORCO Asset Even Before the First Meeting of the Newly-Elected Board**

124.    On or about February 4, 2013, at Vitek's direction, Ott sold off ORCO's interest in the Endurance Office Sub-fund to J&T Banka for €8.7 million.

125.    Neither Vitek nor Ott disclosed J&T Banka's affiliation with Vitek, nor the fact that they knew the sale price was below the true value of the Endurance Office Sub-fund's assets in light of the artificial financial distress brought on by Vitek's misinformation campaign.

126.    After the new ORCO Board of Directors was elected, directors unaffiliated with Vitek or Ott requested that ORCO management provide the new Board with information regarding the sale of ORCO's units in the Endurance Office Sub-fund.

127.    At the request of Ott, Vitek, or their agents, Kingstown Capital's board representative travelled from New York City to attend a February 25, 2013 meeting of ORCO's newly-elected Board of Directors, which was held in London.  Vitek also attended the February 25, 2013 Board of Directors meeting in person.

128.    At the February 25, 2013 meeting, Vitek blocked Kingstown Capital and Alchemy's long-stated plan to buy additional ORCO shares to complete ORCO's necessary recapitalization. In doing so, Vitek prevented ORCO from reaching financial stability through the straightforward mechanism of selling equity on terms that would allow all shareholders to participate and prevent dilution.

129.    Vitek could not acquire any more equity himself without risking passing the statutory threshold for a compulsory takeover offer under the Takeover Bids Act, yet he did not want Kingstown Capital and Alchemy to increase or maintain their shareholdings either.

130.    Further, Vitek had an interest in keeping ORCO financially constrained as a pretext to justify management's (*i.e.*, Ott's) decision to sell ORCO's valuable assets to entities secretly controlled by Vitek at discounted prices.

131.    When pressed for more information regarding the sale of ORCO's stake in the Endurance Office sub-fund to J&T Banka, Ott told Kingstown Capital's board representative that J&T Banka was an arm's-length, third-party purchaser. Further, ORCO management promised to send the Board of Directors the minutes from the meetings at which the sale was discussed and approved by the prior board.

132.    At Vitek's direction, Ott and ORCO management failed to disclose full information regarding ORCO's financial condition to the Board of Directors at the February 25, 2013 meeting in order to justify asset sales to Vitek-controlled entities. Ott and Vitek also failed to disclose the self-dealing nature of these transactions, which resulted in Vitek fraudulently acquiring ORCO's valuable assets at below-market prices, at a time when Vitek himself sat on the Board.

133.    To hide their secret agreement with one another, Ott and Vitek staged fake arguments at the February 25, 2013 Board meeting. Ott pretended to oppose Vitek's goals and to be acting in the interests of ORCO and its shareholders.  To further the ruse, Vitek directed Ott to vote against him, knowing that he controlled sufficient other votes to ensure a favorable outcome.

134.    The contrived disagreements by Vitek and Ott at the February 25, 2013 ORCO Board of Directors meeting were intended to, and did, mislead Kingstown Capital, and thereby furthered Vitek's fraudulent scheme by preventing discovery of Vitek's secret control of the ORCO Board.

135.     Shortly after the February 25, 2013 Board meeting, Ott and Vitek caused ORCO to circulate to its board members minutes of that meeting that furthered their fraudulent scheme. For example, at Vitek's direction, the minutes omitted statements made by Vitek during the board meeting that implied he had greater control over ORCO than officially disclosed.  The minutes also state that, as required under Luxembourg law, the directors were required to and did disclose any conflict between their interests and those of ORCO in any business or matter to be resolved upon by the Board of Directors.  Vitek and Ott misleadingly stated they had no conflicts of interest relating to multiple agenda items, including the sales of assets and capitalization.  As reflected in later board minutes, Vitek and Ott continued to misrepresent their purported lack of any conflict of interest in order to mislead Kingstown Capital.

136.     On or after February 25, 2013, Tommasini circulated the minutes from the ORCO Board meetings that occurred earlier on January 25 and 29, 2013, along with a memo from ORCO management to the prior Board members that laid out management's recommended terms for disposing of ORCO's interest in the Endurance Office Sub-fund.  The Endurance Office Sub-fund disposal memo had substantially false and inaccurate information regarding those transactions.

137.     First, the memo failed to disclose that Vitek, who was directing the actions of Ott and ORCO management, was behind the misinformation campaign that caused the Endurance sub-funds to experience artificial financial constraints.

138.     The memo failed to disclose that J&T Banka, working with Vitek, knowingly acquired other investors' shares at distressed prices that did not reflect the underlying value of the Endurance Office sub-funds.

139.    The memo recommended that ORCO sell its stake in the Endurance Office
Sub-fund at a price equal to the artificially distressed price at which J&T Banka was able to
acquire other investors' stakes in December 2012. ORCO management, at Vitek's direction,
thereby affirmatively represented that the distressed price reflected the fair-market value of
ORCO's interest in the Endurance Office Sub-fund. This representation was knowingly and
wilfully false.

140.    The dissemination of this memo by Tommasini, at Ott and Vitek's direction, to
the Board of Directors on or after February 25, 2013 furthered Vitek's fraudulent scheme by
providing false justification for the terms of ORCO's disposal of the Endurance Office sub-
funds.

141.    Next, on March 15, 2013, Vitek directed Ott to sell ORCO's 50% interest in
another Endurance Real Estate Fund asset, the Office II Sub-fund, to J&T Banka, for €1.2
million.  ORCO's stake was worth many times that amount.

142.    The Office II Sub-fund was sold to J&T Banka at a depressed price that had been
caused by fraudulent misinformation disseminated by Vitek and his agents. Vitek, with J&T
Banka's help, planned to loot the Endurance Office sub-funds' underlying assets, worth an
estimated €330 million total.

143.    As with the sale of ORCO's interest in the first Endurance sub-fund, neither Ott
nor Vitek disclosed J&T Banka's connection to Vitek to ORCO's Board of Directors, or to
ORCO's shareholders.

144.    ORCO held subsequent Board of Directors meetings where Vitek and Ott again
failed to disclose their covert cooperation in furtherance of Vitek's fraudulent scheme, and Ott, at
Vitek's direction, again pretended to disagree with Vitek.  These meetings occurred at ORCO's

Paris headquarters on or about March 28, 2013, telephonically on or about April 24, 2013, and again in Paris on or about May 15, 2013.  Following each meeting, Ott and Vitek caused ORCO to circulate minutes of the meetings – including to Kingstown Capital in Manhattan – that had been intentionally altered, at Ott and Vitek's direction, to leave out or downplay contentious discussions at the meeting, including certain comments by Vitek that alluded to his covert control of additional ORCO stock.

145.    Kingstown Capital's representative attended the March 28 and April 24 meetings telephonically from Manhattan, and attended the May 15 meeting in Paris in person.

146.    Kingstown Capital's board representative also attended a lunch with Vitek and Ott on or about May 15, 2013, following a board meeting, where again, Vitek and Ott pretended to repeatedly argue in the presence of Kingstown Capital's board representative, furthering their deception and Vitek's fraudulent scheme.

**H.    Vitek, with Ott's Help, Fraudulently Takes Over ORCO's Day to Day Operations**

147.    In March 2013, local ORCO employees in Prague reported that employees of Czech Property Investments, a.s. started to run ORCO's operations in the Czech Republic, notwithstanding the failure of the board to authorize such activities.

148.    By May 2013, the manager of ORCO's properties in the Czech Republic, Slovakia, Poland, and Hungary – a property management company based in Chicago – reported that it had been forced out by Vitek and Czech Property Investments, a.s. employees, who had taken over day-to-day operations at ORCO. Vitek had effectively started running ORCO, without ever notifying shareholders, let alone securing the approval of ORCO's Board of Directors.

I.     **J&T Banka, Acting in Concert With Vitek, Takes Over a Majority of the Endurance Office Sub-Funds and Control Over Its Advisory Board**

149.    By May 2013, J&T Banka had acquired about 73% of the units in both of the Endurance Office sub-funds.  The only remaining unitholders in the Endurance Fund's Office and Office II sub-funds were three Danish investment funds, which held a combined 27% stake.

150.    The managing regulations of the Endurance Real Estate Fund provided for two levels of governance for the sub-funds: a Unitholders Meeting and the Advisory Board.

151.    The Endurance Office sub-funds' managing regulations specified that certain actions, including liquidating an entire sub-fund, required a 75% vote at a Unitholders Meeting, with each unitholder casting a vote in proportion to its stake in the sub-funds.  Because the Danish funds held 27% of the units in each sub-fund, they could block any action that required 75% approval by unitholders.

152.    The Endurance Office sub-funds' managing regulations also provided that most major decisions regarding the sub-funds, including the sale of sub-fund assets, could be made by a majority vote of the sub-fund's Advisory Board, which in May 2013 had eight seats.

153.    Under the managing regulations, each unitholder with more than a 2% interests in the sub-funds was entitled to a single seat on the Advisory Board. However, the rules did not provide for a board election or proportional representation. Instead, a single unitholder such as J&T Banka that held a 73% stake was not be entitled to more seats on the Advisory Board than each of the three Danish funds, which collectively held a 27% stake.

154.    In or about May 2013, in a plan to take control of the Advisory Board, J&T Banka arranged for its 73% interest to be split between itself and five entities set up by clients of J&T Banka as straw purchasers, each of whom agreed to cast their vote as directed by J&T Banka and Vitek.

155.     Thus, after these transfers, Vitek and J&T Banka had control of five of the eight seats, and thus could direct the outcome of every Advisory Board vote.

156.     J&T Banka held one of the Advisory Board seats in its own name, and five other straw purchasers each held another seat, including the following four entities: Gomanold Trading Limited (represented by Marek Galvas, a lawyer at J&T Banka), Simfax Trading Limited (represented by Miroslav Minarik, a manager at J&T Banka), Myzer Limited (represented by Vit Urbanec, a long-time associate of Vitek's), and Mustand Investment Limited (represented by Martina Ehnova, an employee of J&T Banka).

157.     J&T Banka and Vitek took control of the Advisory Board in order to bypass the Danish funds' veto on the Unitholders Meeting vote. Further, they engaged the services of a leading international law firm, and procured a legal opinion agreeing that auctioning off all of the sub-funds' assets was a sale of assets (which could be accomplished by a simple majority vote of the Advisory Board, which J&T Banka and Vitek controlled) rather than a liquidation of the sub-funds (which would have required a 75% vote at a Unitholders Meeting, and therefore could have been blocked by the Danish funds).

158.     With control of the Advisory Board and its legal opinion in hand, J&T Banka moved to sell the assets of the Endurance Office sub-funds.  As intended, the only serious bidder for these assets was Sidoti, a.s., an entity nominally owned by Milada Mala, Vitek's mother, but in fact controlled and beneficially owned by Vitek himself.

159.     The Danish funds, suspicious of J&T Banka's proposed sale, sent letters to J&T Banka, Sidoti, and ORCO (in its role as the fund manager of the Endurance Real Estate Fund), asking whether there was any link between J&T Banka, Sidoti, and other Endurance sub-fund

unitholders. J&T Banka, along with Sidoti and the five straw purchasers, falsely denied any affiliation with one another.

160.    Not prepared to give up without a fight, the Danish funds submitted their own bid shortly before a Unitholders Meeting and Advisory Board meeting scheduled for June 19, 2013. The Danish funds bid just over €52 million, barely out-bidding Sidoti's prior bid.

161.    Just hours before the June 19, 2013 Unitholders Meeting, Sidoti put in a final bid of €52.53 million, just a bit higher than the Danish funds' bid.  At Vitek's direction, the fund manager, ORCO, did not inform the Danish funds of Sidoti's new bid until the Unitholders Meeting had already begun.

162.    No representative for Sidoti showed up to the June 19, 2013 meetings where the bids were considered.  When the Danish fund attempted to submit a bid of €52.75 million in response to Sidoti's final bid, the Advisory Board, under the covert control of J&T Banka and Vitek, took the position that it would be unfair to allow the Danish funds to submit a late bid with no representative of Sidoti present at the meeting to counter.

163.    The Danish funds requested that the Advisory Board defer its decision on whether to accept Sidoti's bid in order to allow Sidoti and the Danish funds the opportunity to engage in further competitive bidding.

164.    The Advisory Board, by a majority vote directed by J&T Banka and Vitek, rejected the Danish funds' request.

165.    After having its high bid rejected by the Advisory Board, the Danish funds took the position that the Advisory Board could not approve the sale of all of the Endurance Office sub-funds' assets to Sidoti, as such an action constituted a liquidation of the sub-funds, rather than a simple asset sale, thus requiring approval by a 75% vote at a Unitholders Meetings.  The

Danish funds hoped to use their 27% stake in the Endurance Office sub-funds to block such approval.

166.    In response to the Danish funds' objection, J&T Banka unveiled the legal opinion from the leading international law firm, which had concluded the Advisory Board's action constituted an asset sale, and thus could be approved by a majority vote of the Advisory Board.

167.    The Advisory Board, controlled by J&T Banka and Vitek, and the fund manager ORCO (also covertly controlled by Vitek) accepted this conclusion, and the Advisory Board formally approved the sale of all Endurance Office sub-fund assets to Sidoti for €52.53 million.

168.    The Endurance sub-funds' combined assets net asset value, even after its artificially reduced valuation, was €57 million, 10% more than the price Sidoti paid.

169.    J&T Banka and Vitek knew that these assets, divorced from the financial problems artificially created by Vitek's misinformation, were in fact worth an estimated €330 million, over six times the price paid to purchase them from the Endurance sub-funds.

**J.    Vitek Allows ORCO to Raise Funds From Kingstown Capital to Avoid Liquidation, and Allow Vitek to Develop Plans to Raid It**

170.    On or about June 27, 2013, ORCO held a general meeting of shareholders, which approved a small issuance of new shares to major shareholders.

171.    Unlike Vitek's prior attempts to issue ORCO shares only to entities he controlled, thereby diluting other shareholders, the June 2013 resolution approved an issuance of new shares on terms that would allow Kingstown Capital and Alchemy to participate.

172.    But the size of the new share issuance (at most 6,666,667 new shares) was not sufficient to fully recapitalize the company, as Kingstown Capital and Alchemy desired and as ORCO needed.  Upon information and belief, Vitek allowed ORCO to raise this limited amount of working capital by selling equity to Kingstown Capital and Alchemy in order to prevent the

company from being liquidated.  Once the necessary financial stability was achieved, Vitek formulated his plans to steal ORCO Germany and appropriate its assets for his personal advantage.

173.    At the same June 2013 meeting, ORCO shareholders elected a new Board of Directors consisting of Kingstown's representative; one representative of Alchemy; Vitek and one of his employees, Dedera; Ott and Tommasini (from ORCO management); and three supposedly independent directors, Wallier, Juan and Edward Hughes.

174.    Vitek therefore had effective control over at least five of the nine directors elected at the June 27, 2013 annual meeting.  Publicly, Vitek had his own vote and Dedera's; secretly, Vitek also could direct the votes of Ott, and through Ott, Tommasini and Wallier.

175.    Upon information and belief, Edward Hughes was also an affiliate of Vitek. Vitek regularly used Hughes as a nominee or proxy when Vitek wanted to secretly exert influence over a company.  Hughes, for example, had served as the nominee owner through a complicated trust and options structure of a company called Marc Gilbert International Ltd., which (prior to its consolidation into CPI PG) owned CPI Hotels, a.s., a company that held all of Vitek's hotel investments.

176.    Following the annual meeting, on or about July 29, 2013, ORCO's Board of Directors approved issuing 6,666,667 new shares at €2.25 per share.

177.    On or about August 28, 2013, these newly authorized shares were sold for a total of €15 million to its largest shareholders in proportion to their existing shareholding: Gamala Limited and Crestline Ventures (two entities Vitek openly controlled), Stationway Properties Limited (controlled by Vitek, but nominally owned by Ott), as well as to Kingstown Capital and Alchemy.

178.     After the August 28, 2013 share purchases, Vitek's public ownership stake in ORCO was 30.72%, and Ott's total stake, held personally and through Stationway, was 9.66%. Because they were working in concert, Vitek and Ott's aggregate interest in ORCO of 40.38% still exceeded the statutory threshold, and thus Vitek and Ott remained in continual violation of the compulsory acquisition offer provision of the Takeover Bids Act.

179.     Kingstown Capital was able to maintain a 12.52% stake in ORCO, and Alchemy was able to maintain a 10.95% stake.

180.     However, €15 million did little to shore up ORCO's finances. Rather, Vitek and his agents and affiliates were still able to use ORCO's capital constraint as a pretextual justification for the sale of valuable assets to entities that were secretly under Vitek's control.

181.     ORCO held a Board of Directors meeting on or about August 29, 2013 in Prague. Ott arranged the August 29, 2013 meeting on behalf of himself and Vitek, and did so knowing and intending that Kingstown Capital's board representative would call in from Manhattan.

182.     At the August 29, 2013 meeting, Alchemy's board representative asked for information regarding the identity of the ultimate purchaser of the real estate assets held by the Endurance Office sub-funds. Specifically, Alchemy asked whether these assets were now held by Vitek, or by a company that Vitek owned or controlled. Vitek's employee and proxy on the Board, Dedera, falsely stated that Vitek did not own or control these assets, and specifically misrepresented that Sidoti was not owned or controlled by Vitek.

183.     By falsely representing that the Endurance Office sub-funds' assets had not been acquired by Vitek, Dedera and Vitek concealed the fact that Vitek had acquired valuable assets from ORCO and engaged in fraudulent related-party transactions.  Had Dedera answered honestly, Kingstown Capital and Alchemy would have been alerted to Vitek's self-dealing, and

41

could have undertaken corrective action, alerted regulators, and considered other alternative courses of action, before Vitek could misappropriate additional assets from ORCO.

### K.    Vitek Completes the Looting of the Assets Formerly Held by the Endurance Office Sub-funds

184.    Starting on or around September 30, 2013, Sidoti began to sell the assets it acquired from the Endurance Office Sub-funds to Czech Property Investments, a.s., and by the end of 2013, it had sold all of these assets to Czech Property Investments, a.s. for a total of 1.69 billion Czech koruna (approximately €65.62 million).

185.    Sidoti realized a €13.09 million profit from the sale of these assets to Czech Property Investments, a.s., as it had purchased these assets from the Endurance sub-funds in June 2013 for €52.53 million. Vitek controlled Sidoti (which was nominally owed by his mother, Milada Mala), and thus, in effect, he received an immediate €6.5 million profit from these transactions.  By passing the investment through Sidoti, Vitek doubled his money because he was entitled to only 50% of Czech Property Investments, a.s.'s profits and equity (thanks to the "parity partnership" with the Investhold Group), but he had complete beneficial ownership over Sidoti.  In this single transaction, Vitek defrauded both ORCO's investors (who were deprived of the fair value of the Endurance sub-funds' assets) and the Investhold Group (which was deprived of its profit participation under the "parity partnership" agreements).

186.    Through this scheme, which began in mid-2012 with Vitek's misinformation campaign, and continued through the manipulation (with the active participation of J&T Banka) of the Endurance Office sub-funds' Advisory Board, Vitek was able to extract from the Endurance Real Estate Fund assets worth an estimated €330 million, with an upfront investment of only €52.53 million, which had been put up by J&T Banka.  (Although Vitek owed half of the equity in Czech Property Investments, a.s., – and thus half of the value of the Endurance Real

Estate Fund assets – to the Investhold Group, as set forth below, Vitek subsequently defrauded Investhold Group by depriving it of its interests in these valuable assets.)

187.   At a valuation of €330 million, ORCO's original stake in these sub-funds (26.9% of the Office Sub-fund, for which it received €8.7 million, and 50% of the Office II Sub-fund, for which ORCO received €1.2 million) was worth approximately €118 million. Therefore, Vitek succeeded in divesting ORCO of almost €120 million in assets, for which J&T Banka paid ORCO less than €10 million.

### L.   Vitek Engages in Covert, Self-Dealing Transactions to Bypass ORCO's Shareholders and Acquire ORCO Germany

188.   Vitek's misappropriation of ORCO's valuable assets was by no means limited to the Endurance sub-funds.  From his position as director and major shareholder, Vitek continued to plot with his associates to identify other valuable assets they could sell to Vitek's entities at substantial discounts.

189.   The next asset to catch Vitek's eye was ORCO Germany, a subsidiary 98% owned by ORCO that had a portfolio of valuable real estate in Germany.  ORCO Germany's assets were undervalued on ORCO's books, insofar as they failed to account for the assets' underlying value as well as their future revenue streams (*i.e.*, lease potential).  Vitek believed ORCO Germany's real estate portfolio to be worth €300 million more than (or almost double) the value given on ORCO's financial statements.

190.   Although Vitek (together with Ott and other agents and associates) owned more of the company than Kingstown Capital and Alchemy, and had influence over a majority of the directors on ORCO's board, Vitek recognized that once Kingstown Capital and other unaffiliated shareholders became aware of ORCO Germany's inherent value, they would oppose any effort to sell such a valuable subsidiary piecemeal at discount prices.

191.    In order to avoid paying true fair-market value to acquire ORCO Germany, Vitek hatched a plan to acquire ORCO Germany in secret. Vitek's objective was to have ORCO Germany issue enough new shares – to be purchased by entities under Vitek's control – such that his stake in ORCO Germany would increase while simultaneously diluting ORCO's stake to the point where it would eventually lose control of ORCO Germany.

192.    Vitek made these acquisitions through shell companies he secretly controlled in order both to avoid alerting ORCO and ORCO Germany investors to the true value of ORCO Germany, and to again evade the compulsory takeover offer requirement under the Takeover Bids Act. Vitek thus intended to eventually acquire control of ORCO Germany without paying anywhere near the true value of ORCO Germany's assets.

193.    First, on June 3, 2013, Vitek arranged for the acquisition of a significant stake in ORCO Germany by Kamoro Limited, a company that had been set up with help from J&T Banka, and which was owned by Lumir Safranek. Safranek is a close friend of Tomas Rybar, Vitek's personal lawyer. Safranek had previously served as Vitek's nominee to help set up Gamala Limited, another company controlled by Vitek and used in furtherance of his scheme.

194.    After its acquisition of ORCO Germany shares, Kamoro Limited held 8.65% of ORCO Germany, and ORCO's interest in ORCO Germany had been reduced to 89.6%. Vitek did not disclose his affiliation with Safranek and Kamoro Limited to the board or shareholders of ORCO, and Vitek and his associates falsely denied any such affiliation.

195.    Vitek next planned for ORCO to approve the issuance of millions of new shares in ORCO Germany to Tandis, a.s., a Czech company wholly owned by his mother, Milada Mala. Under Vitek's plan, ORCO Germany would issue 114,600,000 new shares and sell them for €53.8 million (€0.47 per share) to Tandis. These shares would give Tandis a 33.25% interest in

ORCO Germany, less than a tenth of a percentage point under the statutory threshold for a compulsory acquisition offer under the Takeover Bids Act.

196.     However, as with ORCO, Vitek's interest in ORCO Germany after the Tandis acquisition should have been aggregated with that of Kamoro Limited, which held 8.65% before the issuance of new shares, due to his covert control of that entity. Thus, following the issuance of new ORCO Germany shares to Tandis, Vitek's true aggregate interest in ORCO Germany was nearly 40%.

197.     While Vitek had previously failed to secure a two-thirds shareholder vote in favor of giving the ORCO Board of Directors the authority to enter into a self-dealing, dilutive new share issuance at the ORCO parent level, Vitek's majority control of the ORCO Board of Directors allowed him to control ORCO's supermajority interest in ORCO Germany. Therefore, through a simple majority vote of the ORCO Board of Directors, Vitek could propose, and have approved, an issuance of new ORCO Germany shares in a self-dealing transaction that diluted other ORCO Germany shareholders – including ORCO itself.

198.     Following this issuance of new share to Tandis, Vitek was required, under the Takeover Bids Act, to make a compulsory acquisition offer to all other shareholders of ORCO Germany, which included ORCO itself.

199.     Had Vitek made a compulsory tender offer at this time – though he did not in fact have the resources to do so – it would have benefited ORCO shareholders by allowing ORCO to realize closer to the true value of its most valuable asset, ORCO Germany. In a compulsory acquisition offer, ORCO would have been entitled to receive a control premium for selling its significant stake in ORCO Germany all at once to a single buyer.

200.    Instead, by gradually diluting ORCO of its interest in ORCO Germany, Vitek was able to deprive the other ORCO shareholders, including Kingstown Capital, of the value of their investment in ORCO through the piecemeal sale of ORCO's major subsidiary, and greatest single asset, to entities Vitek secretly owned or controlled.

201.    Had Kingstown Capital and Alchemy been aware of Vitek's secret control of the ORCO Board of Directors, they could have taken the corrective actions previously described. Had Kingstown Capital and Alchemy been on a properly constituted ORCO Board of Directors – one that was not secretly controlled by Vitek – such a board would have undertaken one of two clearly superior courses of action, and either (1) maintained ORCO's supermajority stake in ORCO Germany, or (2) sold off ORCO's entire interest in ORCO Germany in a single sale, which would have allowed ORCO to obtain a control premium for the sale of its supermajority stake in ORCO Germany, and thus would have allowed ORCO shareholders, such as Kingstown Capital, to realize the value of their investment in ORCO.

202.    In or about November 2013, ORCO's books valued ORCO's stake in ORCO Germany at €320 million, yet Vitek believed it was in fact worth €620 million. The 33.25% stake Vitek wanted ORCO to sell to Tandis for €53.8 million was valued (on ORCO's books) at more than €100 million, and according to Vitek's own valuation, Tandis's stake in ORCO Germany would be worth more than €200 million.

203.    Vitek recognized that Kingstown Capital would oppose his plans to have ORCO Germany issue new shares on these terms for two reasons.  First, the shares were being sold at well below their net asset value, even as calculated by ORCO.  And second, selling so many new shares would further dilute ORCO's stake in its subsidiary, taking ORCO perilously close to the point at which ORCO would lose a controlling interest in ORCO Germany.

204.    Upon information and belief, Vitek instructed Ott not to include the proposal to authorize ORCO Germany's registration of new shares on the written agenda that was circulated to ORCO directors ahead of the ORCO Board of Directors meeting scheduled for November 27, 2013 in order to prevent Kingstown Capital and Alchemy's board representatives from fully preparing for the meeting. By keeping Kingstown Capital and Alchemy in the dark, Vitek hoped to prevent them from effectively opposing this self-dealing, dilutive issuance of ORCO Germany shares.

205.    Vitek directed Ott to exert his influence over Tommasini and Wallier, and to make sure all three of them voted in support of Vitek's plan to cause ORCO Germany to approve a dilutive share issuance over the opposition of other ORCO shareholders and their board representatives.

206.    At Vitek's direction, Ott scheduled an ORCO Board of Directors meeting for November 27, 2013, in Berlin. Ott arranged for Kingstown Capital's board representative to attend telephonically from Manhattan.

207.    When Ott refused to answer questions from Kingstown Capital and other minority shareholders at the November 27, 2013 ORCO Board of Directors meeting, a heated argument ensued, and the meeting was adjourned to November 29, 2013. Ott and Vitek intended to make it as difficult as possible for Kingstown Capital and Alchemy to oppose the ORCO Germany share issuance: Vitek directed Ott to hold the vote to authorize the ORCO Germany new share issuance once the ORCO Board of Directors meeting was reconvened, despite Ott's intentional failure to follow proper board procedure by omitting the proposal from the written agenda circulated ahead of the November 27, 2013 meeting.

208.    As with prior ORCO Board of Directors meetings, Tommasini served as ORCO's board secretary, and was charged with keeping the minutes of the meetings. Tommasini, at the direction of Ott and Vitek, falsified the recorded minutes so as to bolster ORCO management's position on any controversial subject.  Subsequent draft minutes therefore contained repeated requests to correct statements that other directors – including Kingstown and Alchemy's representatives and one or more independent directors – did not believe occurred at the meeting, or were mischaracterizations of historical fact.  For example, the ORCO board meeting minutes omit certain conditions Wallier placed on his vote in favor the ORCO Germany share issuance resolution.  Wallier insisted that the ORCO Germany share issuance be open to all shareholders, including minority shareholders of ORCO and ORCO Germany. Wallier's conditions, which were not reflected in the minutes, were not met when only shareholders above a certain ownership threshold were allowed to participate.  Tommasini knowingly transmitted the altered draft board minutes at the direction of Ott and Vitek, and in furtherance of Vitek's fraudulent scheme, including to Kingstown Capital's representative in Manhattan.

209.    In an e-mail on November 29, 2013, Ott informed the ORCO Board of Directors for the first time that there would be only one item on the meeting agenda: a vote on the proposal to raise capital by issuing ORCO Germany shares to Tandis. Directors representing Kingstown Capital and Alchemy objected to the substance of the proposal and noted that a vote on the proposal was not procedurally proper; further, these directors requested that the vote be postponed so that the proposal could be properly considered by the board. Ott, at Vitek's direction, refused to postpone the vote.

210.    On November 29, 2013, the ORCO board met without Kingstown Capital's or Alchemy's representatives, and approved the plan to have ORCO Germany issue new shares

under the terms outlined above.  Kingstown Capital and Alchemy refused to attend the board meeting because they knew that Vitek controlled the board and that the outcome of the result was inevitable.  Believing that they had some allies on the board, they therefore attempted to block a vote that worked to the detriment of ORCO's shareholders and for Vitek's personal benefit by depriving the board of a quorum.  Ultimately, however, the Kingstown Capital and Alchemy representatives failed to understand how completely Vitek dominated the ORCO board at that point, and they were unable to stop the vote.

211.    Vitek and his employee, Dedera, were considered to be interested parties, and therefore were forced to abstain from voting on whether ORCO Germany should issue new shares.  Ott and Tommasini voted in support of the resolution, but requested that ORCO's general counsel, Brad Taylor, verify and give an opinion on whether they had any conflict of interest in the transaction.  Guy Wallier and Ed Hughes also voted in favor of the ORCO Germany resolution.  Only Alexis Juan voted against the ORCO Germany resolution.

212.    Had the four directors who were secretly working in concert with Vitek abstained from voting, the ORCO Germany resolution would have failed, even without the votes of Kingstown Capital's and Alchemy's representatives.

213.    Following the board meeting, ORCO's general counsel gave an opinion confirming that Ott and Tommasini did not have a conflict of interest and therefore properly voted on the ORCO Germany resolution.  In fact, Ott and Tommasini knew that they were conflicted due to their cooperation with Vitek, who was obviously conflicted.

214.    Vitek instructed Ott to engage in the conduct described above with respect to the ORCO Board of Directors meeting held on November 27 and 29, 2013 in order both to force the

ORCO Germany share issuance to Tandis, and to conceal the source of the funds used by Tandis to acquire the new shares issued by ORCO Germany.

215.    Vitek himself had arranged for J&T Banka to provide the funds that Tandis used to acquire its stake in ORCO Germany.  But Vitek hid his involvement using a shell corporation in order to disguise the source of these funds from ORCO shareholders and unaffiliated members of ORCO's Board of Directors, and thereby undermine any effort to oppose the self-dealing, dilutive issuance of new shares by ORCO Germany.

216.    The market recognized that the new share issuance to Tandis was not beneficial to ORCO or its shareholders: In the four weeks following the announcement of the issuance, the price of ORCO shares plunged by 22%.

217.    On December 4, 2013, Capstone Equities Capital Management, another minority ORCO shareholder based in Manhattan, which – like Kingstown Capital and Alchemy – opposed the dilutive ORCO Germany share issuance, wrote to the ORCO and ORCO Germany boards of directors, informing them that Capstone had identified several companies that would be prepared to pay a much higher price for ORCO Germany shares than the €0.47 per share price offered exclusively to Tandis. Despite this fact, ORCO and ORCO Germany never asked for further information about these potential buyers, nor sought out other bidders to determine whether they would pay more than €0.47 per share.

218.    Capstone's letter also proposed giving all ORCO shareholders the opportunity to buy new shares of ORCO Germany on the same terms as were offered to Tandis. If the terms of the share issuance were fair and the result of arm's length negotiations, then there was no reason to deny any existing ORCO or ORCO Germany shareholder the same opportunity, or to prefer

Tandis. Yet the ORCO Board of Directors, which was dominated by Vitek and his affiliates, never took up this proposal—in effect, rejecting it through inaction.

219.    There was no legitimate reason for this dilutive capital raise, which constituted nothing more than an illegitimate means of transferring value from ORCO to Vitek himself.

220.    By December 2013, Vitek effectively controlled 39.08% of ORCO Germany's shares, well above the statutory threshold for a compulsory acquisition offer under the Takeover Bids Act. However, because his illicit agreement with Ott and others was still secret, Vitek's official, public ownership interest was not enough to alert other shareholders that he had passed the threshold.

221.    On or about December 20, 2013, Ott convened an ORCO Board of Directors meeting telephonically, which was attended by Kingstown Capital's representative in Manhattan. The meeting quickly devolved into disputes between Kingstown Capital and Alchemy's board representatives, on the one hand, and Ott, Tommasini and Dedera, on the other. Vitek was represented at the December 20, 2013 ORCO Board of Directors meeting by proxy.

222.    On the December 20, 2013 Board call, several of Vitek's associates falsely represented that Vitek had no intention of risking ORCO's controlling share of ORCO Germany through the new ORCO Germany share issuances.

223.    Ahead of the December 20, 2013 call, an independent ORCO director, Alexis Juan, requested that the meeting be recorded in light of disputes regarding what statements had been made at the November 2013 ORCO Board meeting, as reflected by the ORCO board's inability to agree on a final version of the previous meeting's minutes.  Ott agreed to Juan's request, and stated that the December 20, 2013 ORCO Board of Directors meeting would be recorded.  During the course of the meeting, Ott again represented that he was recording it.  After

the call, however, Ott refused to share the resulting recording, or a transcript, with the Kingstown Capital or Alchemy ORCO board representatives, and no minutes of the December 20, 2013 ORCO Board of Directors meeting were ever circulated.

224.    Shortly after the December 20, 2013 call, Juan resigned from the ORCO board.

225.    On or about January 6, 2014, ORCO shareholders voted to remove all of the directors who opposed ORCO Germany's new share issuance – that is, Kingstown Capital and Alchemy's board representatives – and accepted the resignation of Alexis Juan. Further, a new board was elected, which consisted of only five directors:  Vitek and his associates Ott, Hughes, Dedera, and Wallier. As a result, as of January 2014, Vitek attained full control of ORCO's Board of Directors.

226.    Upon information and belief, Vitek opposed Tommasini's re-election to the ORCO Board of Directors for two reasons:  to further the ruse that Vitek was acting independently from ORCO management (Tommasini continued to be Chief Operating Officer and Deputy CEO), and due to Vitek's personal dislike for Tommasini.

227.    Vitek and Ott together controlled less than a majority of ORCO's shares, and nearly every other ORCO shareholder opposed the ouster of the Kingstown Capital board representative. However, two Cyprus-based entities named LCE Company Limited (formerly known as Notafko Limited) and Levos Limited owned enough shares to swing the vote Vitek's way.

228.    Upon information and belief, both of these entities were controlled by J&T Group, although that was never disclosed to Kingstown Capital or other ORCO shareholders unaffiliated with Vitek.

229.     On the heels of the first new ORCO Germany share issuance and the ousting of opposition directors from the ORCO board, Vitek planned a second new ORCO Germany share issuance on similar terms, this time to an entity controlled by Ott.

230.     On or about March 3, 2014, ORCO Germany sold more than 76 million shares to Ott's Stationway Properties Limited at €0.47 per share, for a total of approximately €36 million. Upon information and belief, Ott could not afford to purchase these shares with his own money, and thus Vitek again arranged for Ott's purchase to be financed by J&T Group.

231.     This transaction resulted in the loss of ORCO control over ORCO Germany.

232.     Notwithstanding the loss of control of ORCO Germany as a result of this second new share issuance, the price paid for the new shares in no way reflected the control premium that would be expected in a rational transaction of this nature.

233.     While Vitek had purported to justify the sale of ORCO Germany stock as a means of raising capital for ORCO, that capital was never brought into the parent company, and once ORCO's stake in ORCO Germany was reduced to 48%, ORCO suddenly became further undercapitalized.

234.     Vitek took advantage of ORCO's even graver financial situation to justify the sale of more ORCO Germany shares to entities secretly under his control.

**M.     Vitek Removes Ott from ORCO's Board of Directors, Then Pays Him a Kickback from ORCO's Assets to Continue Their Deception**

235.     On or about January 14, 2014, on a conference call with representatives of Kingstown Capital and Alchemy, among others, Vitek discussed the dismal performance of management, and discussed provisions in management's contract relating to a parachute payment that would be owed to management if they were fired. Vitek failed to disclose his prior secret

agreements with Ott, which would have been material information to the other ORCO stakeholders on the call.

236.    In statements printed on January 24, 2014, Vitek was quoted as stating that ORCO might end up liquidated, and that the company was plagued by poison pills and massive unbooked liabilities. Vitek's public statements to the media were intended to, and had the effect of, depressing ORCO's share price.

237.    On or about March 27, 2014, Ott was terminated by the ORCO Board of Directors, along with the rest of management.

238.    Up until this point, Ott and Vitek had continued the ruse that they were independent of, or even hostile toward, one another. Indeed, they would stage fights during ORCO Board of Directors meetings, yet Ott and management sided with Vitek on every important vote.

239.    After being fired from the board, Ott insisted that ORCO owed management a parachute payment.  Although ORCO likely did not owe Ott the payment under the terms of his contract, in exchange for Ott's agreement to maintain their prior agreement to work in concert, Vitek agreed to cause ORCO to make the parachute payment valued at €16 million in cash and real estate.

### N.    Vitek Secretly Acquires A Controlling Interest In ORCO Germany

240.    At a May 2014 ORCO shareholders meeting, ORCO shareholders finally approved the set of proposals that Vitek had first made in his December 31, 2012 letter to the then-Board.  The nominal value of ORCO shares was reduced from €1.00 to €0.10 per share, 200 million additional shares were approved to be issued (a 175% increase), and shareholder dilution protections were overridden.

241.    In June 2014, ORCO completed the sale of more than half its remaining shares in ORCO Germany on terms that deprived ORCO and its shareholders of any substantial benefit. And yet again, these shares were purchased by an entity owned by Vitek and financed by J&T Group.

242.    By mid-2014, Vitek had acquired more than 90% of the diluted equity in ORCO Germany, and, by means of his fraudulent scheme, Vitek had done so for less than a quarter of the price that ORCO Germany's assets were worth by Vitek's own calculations. In short, Vitek successfully issued shares representing nine times the number of shares that were outstanding prior to his takeover of the ORCO board, and he or his affiliates acquired all of them at a fraction of what Vitek would have had to pay in an arm's-length transaction.

243.    Throughout the period when these events transpired, Vitek and his agents and affiliates acted to conceal their relationship, and to prevent other interested parties, including Kingstown Capital and its agents, from taking actions to protect their rights.

244.    At the same time, Vitek's investment in ORCO and ORCO Germany was a violation of the understandings and agreements with his Investhold Group parity partners (Messrs. Cmejla and Divis), who were mostly kept in the dark regarding the details of Vitek's ORCO investment, including the significant liabilities to J&T Group he undertook on behalf of Czech Property Investments, a.s.

**O.      Vitek Fails to Honor Investhold Group's Right to Oversight and Joint Control of Partnership Investments, and Defrauds It Of Its Interest in Assets of ORCO Germany**

245.    As set forth above, in or about November 2012, Vitek and Marek Cmejla entered into what Vitek called a "parity partnership," in which, among other things, Vitek agreed to consult with Mr. Cmejla regarding all investment opportunities.  After Mr. Cmejla and Mr. Divis bought in to the parity partnership, Vitek was supposed to share every new business opportunity

with them 50-50, and was therefore not entitled to do any business on his own without the consent of Mr. Cmejla and Mr. Divis.  Any such investments were to be financed by the parity partnership, which Mr. Cmejla's (and Mr. Divis's) original contributions to the partnership had largely financed, with Investhold and Vitek splitting the equity and profits evenly, and sharing control over the investment.

246.    From almost the start of this relationship, however, Vitek violated the terms of his agreement with Mr. Cmejla, keeping the most valuable investments for himself.  This betrayal culminated in Vitek's scheme to take over ORCO and its valuable assets, which (in addition to having been accomplished through Vitek's fraud, as explained above) was entirely concealed from Marek Cmejla.

247.    After Vitek's takeover of ORCO's board was complete, he turned to Investhold for assistance.  He put forward a plan to use Czech Property Investment, a.s., the company in which Investhold previously invested millions of dollars, as a source of funding to complete the acquisition of a real estate investment group that had been stripped of its most valuable assets and saddled with onerous liabilities to Vitek's criminal enablers at J&T Banka.  Specifically, in or around June 2014, Vitek told Investhold that it could become an equal partner in Vitek's 91.3% stake in ORCO Germany.  As with nearly all of his financial dealing with Investhold, this proposal was prelude to Vitek's true intentions: to acquire underpriced real estate assets for his personal gain.  Vitek certainly did not disclose how he had come to control ORCO Germany, as set forth above.  Vitek selectively disclosed only positive information about the investment, and, with only that limited knowledge, Mr. Cmejla agreed to the transaction.

248.    Investhold had the right to appoint half of the directors sitting on the board of any company that was part of the "parity partnership."  From in or about March 2010 up to and

including in or about February 2014, Investhold appointed one of its attorneys as its representative on the boards of all relevant companies. In or about February 2014, Investhold designated a different attorney as its representative.

249.    Vitek seemed to continue to honor the "parity partnership" well into 2014. For example, Vitek directed the members of the boards of each company that he jointly owned with Investhold that the Investhold representative's questions should be answered, and that the Investhold representative should be provided with all documents she requested, such that she could have all the information necessary to oversee Investhold Group's investment and execute her fiduciary duties to other shareholders as a board member. Additionally, Vitek agreed to meet regularly with Marek Cmejla to discuss their investments.

250.    In mid-2014, as Vitek was completing his acquisition of ORCO Germany through the scheme described above, he decided to use Czech Property Investments, a.s. equity as consideration to finish acquiring enough shares in ORCO Germany to have an over 90% interest in that company. Under the terms of their "parity partnership" and various written contracts between Vitek and Investhold, however, Vitek did not have the right to unilaterally contribute Czech Property Investments, a.s. equity. Any such contribution of equity would have required both Investhold's consent, as well as the modification of the contracts that protected Investhold's rights to an equal share of profits and equity.

251.    In or about April 2014, in Prague, Vitek and Marek Cmejla met in person to discuss the state of their shared investments. At this meeting, Vitek disclosed his plan to make Czech Property Investments, a.s., a subsidiary of ORCO Germany, thereby using Czech Property Investments, a.s. equity as the means to complete the takeover of ORCO Germany. However, Mr. Cmejla did not agree to this restructuring at that meeting, as he was unwilling to give up the

security of Investhold's investment in the "parity partnership" that the existing contracts provided.  During their regular meetings throughout the middle of 2014, Vitek repeatedly pressured Mr. Cmejla to consent to allowing Czech Property Investments, a.s. to become a subsidiary of ORCO Germany.

252.    Because such an arrangement would have taken the ownership of Czech Property Investments, a.s. away from Investhold (which owned a 50% stake, pursuant to the "parity partnership") and given it almost entirely to Vitek (who was in the process of acquiring a more than 90% stake in ORCO Germany, which was to be the parent company and new owner of Czech Property Investments, a.s.), Investhold insisted that before any such restructuring could be considered, its investments needed to be secured.

253.    In a meeting that took place in Prague in or around the end of May 2014, Mr. Cmejla finally relented, and agreed to consent to the restructuring of their partnership investments. In return for the termination of Verali's contracts, which had prevented the transfer of Czech Property Investments, a.s. to ORCO Germany, Vitek agreed to enter a new agreement with Investhold that would have secured its investments.

254.    To give Vitek the time necessary to use Czech Property Investments, a.s.'s equity to complete his takeover of ORCO Germany, Milada Mala (Vitek's mother) and Investhold Ltd entered into a short-term credit agreement, with an initial term of 4 months.  Under the credit agreement, Investhold Ltd. received a promissory note for 13 billion Czech koruna backed by a guarantee from Czech Property Investments, a.s. in exchange for the release by Verali Limited of its right to receive half the shares in Czech Property Investments, a.s.

255.    At the same time, Vitek consulted with Mr. Cmejla and Mr. Divis regarding loans totaling €203 million taken out from J&T Banka and Postova Banka in connection with the

acquisition of ORCO Germany.  These loans were the only "official" financing from J&T Banka and Postova Banka (in the amounts of €114.5 million and €88.5 million, respectively).  These loans were used mainly for the purchase of ORCO Germany (now called "CPI PG") shares from minority shareholders (Gamala, Stationway, Aspley, and Kamoro) in June 2014, just before the contribution in kind of Czech Property Investments, a.s. to ORCO Germany.  The loans were taken on by the Czech company Materali, a.s., one of the five entities chosen as CPI PG holding companies as part of the Vitek's supposed agreement with Mr. Cmejla to maintain the "parity partnership" and secure Investhold Group's investment in the real estate empire Vitek built with Investhold's capital.

256.    In or about June 2014, Vitek completed the takeover of ORCO Germany using his five Czech holding companies: Materali, a.s., Rivaroli, a.s., Zacari, a.s., Mondello, a.s., and Lavagna, a.s.  First, Materali, a.s. acquired ORCO Germany shares from entities that were controlled either by Vitek himself or by people working in concert with him: Aspley Ventures Limited, Gamala Limited, Stationway Properties Limited, and Kamoro Limited.  A few days later, Vitek finalized the takeover of ORCO Germany by causing it to issue capital in exchange for contribution in kind of Czech Property Investments, a.s. into ORCO Germany.  Then, Vitek distributed the newly-acquired ORCO Germany shares between his other four holding companies, Lavagna, a.s., Mondello, a.s, Zacari, a.s. and Rivaroli, a.s.  Vitek's five holding companies thus became the new ORCO Germany shareholders and Vitek, through his five companies, became the majority owner of ORCO Germany, with an indirect stake of more than 90% by the end of June 2014.  In or about August 2014, ORCO Germany changed its name to CPI Property Group, or CPI PG.

257.    In or about October 2014, the short term credit agreement between Milada Mala (Vitek's mother) and Investhold Ltd neared maturity.  At the time, Vitek claimed not to be ready to discuss a new equity agreement that would have formalized Investhold's equity in CPI PG.  As a result, the parties agreed to extend the terms of the credit agreement for approximately two more months, through the end of 2014.

### P.    Vitek Secretly Acquires Majority Control of ORCO

258.    In November 2014, Fetumar Development Limited and Aspley Ventures Limited each acquired over a 30% interest in ORCO through a capital raise in which each of them subscribed to 100,000,000 new shares in ORCO with a par value of €0.10 each, at a subscription price of €0.296 per share, for a total cash contribution of €59.2 million.  Fetumar Development Limited and Aspley Ventures Limited thus became ORCO shareholders with a combined 60% stake in ORCO.  Both capital raises were fully financed by J&T Group.  Upon information and belief, J&T Banka, a.s. provided financing through official bank loans of €29.6 million to each company.  J&T Banka was only able to provide that level of financing, consistent with rules promulgated by the Czech National Bank, because Fetumar and Aspley were held out as being independent from Vitek, though in fact the beneficial owners of each company were later found by Luxembourg's capital markets regulator, the Commission de Surveillance du Secteur Financier (CSSF), to have been working in concert with Vitek.  Upon information and belief, Vitek personally guaranteed the repayment of these loans – together with the interest and other costs of financing – to J&T Group.

259.    As set forth above, Fetumar was nominally owned by defendant Jan Gerner.  Aspley was nominally owned by defendant Pavel Spanko.  In truth and in fact, however, both Fetumar and Aspley were controlled by Vitek, who was the true beneficial owner of their shares of ORCO.

260.    As a result of Fetumar and Aspley's acquisition of ORCO shares – in addition to the approximately 11.2% Vitek owned directly or indirectly in his own name, and the 3.5% nominally owned by Ott but controlled by Vitek – Vitek acquired a nearly 75% interest in ORCO.  As of November 2014, therefore, Vitek effectively had absolutely control over ORCO.

### Q.    Vitek Formalizes His Partnership With Investhold – Even As He Continues To Deceive It

261.    After (secretly) completing his takeover of ORCO, Vitek told Investhold that he was prepared to negotiate the terms of Investhold's equity agreement, which would have restored Investhold's 50% equity position in all assets that were part of the "parity partnership."

262.    On or about December 5, 2014, Milada Mala, Vitek, and Marek Cmejla (on behalf of Investhold Ltd and Investhold Group) signed a new agreement.  Under this agreement, Investhold Ltd released Vitek from his obligation to repay Investhold Ltd under the June 9, 2014 short-term credit agreement, and instead Investhold Group's rights to equal equity and profits were secured by 50% of the shares in four Czech holding companies, Materali, a.s., Zacari, a.s., Mondello, a.s. and Lavagna, a.s., which, along with Rivaroli, a.s., a fifth company wholly-owned by Materali, a.s., collectively held more than 90% of the equity in CPI PG.

263.    Further, under the December 5, 2014 agreement, Investhold was given the control rights it was entitled to under the "parity partnership."  Specifically, Investhold Group had the right to appoint a representative to the boards of directors for each of four CPI PG holding companies, Materali, a.s. (and thus also its subsidiary, Rivaroli, a.s.), Zacari, a.s., Mondello, a.s. and Lavagna, a.s.  Similarly, all five entities were constrained by a deadlock mechanism, such that no board action could be approved without Investhold Group's consent.

264.    These corporate governance mechanisms were put in place to ensure Investhold and its investors that they would have access to sufficient information to monitor the parity

partnership's investments, and that no major business decision could be made without Investhold Group's consent.

265.    The December 5, 2014 agreement therefore appeared to mirror the terms of the "parity partnership," insofar as it purported to give Investhold equal equity, right to profits, and control.  In truth, however, Vitek had no intention of honoring the spirit of that agreement, and used the corporate structure he had devised – in which Investhold's rights attached to the four holding companies, and not to CPI PG itself – to further defraud Investhold and to further his ultimate goal by bolstering his ability to carry out his real estate misappropriation scheme.

266.    Although, upon information and belief, Vitek planned all along to double-cross Investhold and keep CPI PG's valuable assets to himself, Vitek assured Investhold that their "parity partnership" agreements and understandings applied to CPI PG. Thus, Vitek promised Mr. Cmejla that Investhold would have equal board representation and oversight over CPI PG itself, in addition to the five holding companies covered by the December 5, 2014 agreement between Vitek and Investhold Ltd.

267.    Vitek never intended to honor these rights.  Rather, Vitek made these false promises to induce Investhold Group to first, give up its 50% interest and joint dead-lock rights in Czech Property Investments, a.s., and then to enter into a new equity investment agreement, in which Investhold Group's investment was converted into the new loan; Vitek never fulfilled his promises to fully implement the parity (dead-lock) rights.

268.    Prior to the restructuring, Investhold Group (through Verali) had the right to convert its investment into a 50% equity stake in Czech Property Investments, a.s., which directly held the partnership's real estate assets. After the restructuring, Investhold Ltd only had the right to convert its investment into half ownership of the four shell companies that held stock

in CPI PG, the parent company of Czech Property Investment, a.s., as well as a promise that Investhold would have board representation and access to information sufficient to oversee CPI PG's operations.  Upon information and belief, Vitek never intended to allow Investhold Group to exercise such oversight, the absence of which was critical to the next step in Vitek's fraud.

269.    In fact, Vitek never permitted Mr. Cmejla to fill Investhold Group's seats on CPI PG's Board of Directors, and failed to provide Investhold with accurate information about CPI PG's finances or operations.  When Investhold proposed multiple director candidates, Vitek rejected each one of them on the pretext that their qualifications were insufficient – something that Vitek had never done previously in all of the "parity partnership's" real estate investments. At that time, however, Mr. Cmejla and his representatives had no reason to doubt Vitek's assertions.

270.    Vitek's true reason for rejecting Investhold's director candidates was to keep Investhold Group from exercising its representation rights, and thereby prevent Investhold from gaining direct access to information on CPI PG's operations and from blocking Vitek's fraudulent plan to misappropriate CPI PG's assets for himself.

### R.    J&T Group Pressures Vitek To Pay Off Some Of His Improper Loans In Light Of Its Potential Acquisition By A Chinese Company

271.    By early 2015, J&T Group had extended hundreds of millions of euros in loans and other forms of financing to Vitek, a debt that eventually totaled approximately €800 million by the end of 2015, including substantial unsecured loans that had been extended to Vitek by Postova bank prior to its acquisition by J&T Group. In the aggregate, these loans to Vitek far exceeded legal limits under Czech and European banking laws, which proscribe limits on a bank's borrowing base, capital ratios, and risk exposure to single lenders.

272.    Under applicable rules, J&T Banka would not have been permitted to have loan exposure to Vitek greater than €215 million. To evade these limits, J&T Group provided much of its financing indirectly, through debt instruments that were not reported as loans to Vitek or as an investment in the name of J&T Group on behalf of Vitek (on the basis of some kind of commission or agency contracts).  For example, in exchange for financing to Vitek, J&T Group held a purported investment in various Croatian luxury hotels through an entity called Prime Tourist Resort, S.A.

273.    In or about early 2015, J&T Group began to pressure Vitek to pay off some of the unsecured debt, which was particularly problematic from a commercial and regulatory perspective.

274.    In or about May 2015, the Chinese company CEFC China Energy Company Limited ("CEFC") bought a 5% share in J&T Banka and Postova Banka's parent company, J&T Finance Group. CEFC later increased its stake to approximately 10%, and it publicly stated its intent to buy up to 50% of J&T Finance Group.

275.    At that time, CEFC was ostensibly privately held, although it had "aligned itself so closely with the Chinese government that it was often hard to distinguish between the two," and it was widely reported that CEFC's investments in the Czech Republic were in furtherance of China's economic diplomacy.[2]

276.    In mid-2015, CEFC was investing heavily in the Czech Republic, not only in J&T Group but also in engineering, brewing, and real estate, as well as a soccer team and an airline.

---

[2]    By in or about 2018, CEFC's ostensible owner had disappeared and its investments in J&T Group were bailed out by Chinese state-owned conglomerate CITIC Group.

CEFC's ostensible owner was, for example, appointed a special economic advisor to the President of the Czech Republic.

277.    J&T Group realized that J&T Banka's outstanding unsecured loans to Vitek could not withstand the increased scrutiny that would take place during CEFC's due diligence.  This potential investment led J&T Banka to attempt to clean its balance sheet of its improper loans and other arrangements with Vitek.  J&T Banka thus started to exert even more pressure on Vitek to pay off his riskiest unsecured liabilities and to decrease the total debt he and his companies owed to J&T Banka and its affiliates.

278.    This pressure from J&T Banka – to come up with hundreds of millions of euros in liquid assets to pay down some of his outstanding debts – drove Vitek to the next stage of his fraud, in which he misappropriated all of CPI PG for himself, notwithstanding his agreements with the Investhold Group.  By no later than their regular meeting in June 2015, Vitek began to withhold material information about CPI PG's operations and corporate affairs that would have led Marek Cmejla and Investhold to protect Investhold Group's interests.

279.    By no later than June 2015, Vitek ordered his agents and employees to stop sharing all material information with Investhold Group, including Investhold's designated representative to the board of directors of the entities that collectively owned more than 90% of CPI PG.  Instead, Vitek and his associates began carefully selecting what information to share with Investhold Group, making slow, incomplete, and misleading disclosures in order to mask Vitek's scheme to take over CPI PG for himself.

280.    For example, when Investhold's board representative insisted on Investhold Group's right to certain financial information, Tomas Rybar (one of Vitek's lawyers) produced only certain documents, and even those had key information redacted.  The selectively-redacted

information included two contracts dated June 23, 2015 that were so heavily redacted that virtually every page carried redactions, including the identities of certain of the parties to the agreements and the meaning of several defined terms.

281.    And, as alleged above, Vitek continued to block Investhold's nominated directors to the board of CPI PG itself through delay and pretext, essentially monopolizing all operational and financial information about CPI PG.  Two of the candidates proposed by Investhold had over three decades of investment management or financial services experience.  Another had about a decade of experience in asset management and real estate development.  The fourth had over two decades experience as a reinsurance underwriter.  All candidates were educated and well qualified.

282.    At the time, during almost every one of their regular meetings, Vitek falsely insisted to Mr. Cmejla that he was honoring the terms and spirit of their agreement to be equal partners.

**S.     Vitek Secretly Causes CPI PG To Take On Approximately €800 Million In Debt To J&T Banka To Finance His Scheme**

283.    Prior to June 2015, Investhold was aware of only approximately €203 million in debt to J&T Group, which Vitek had consulted with Messrs. Cmejla and Divis about in June 2014, as alleged in paragraph 255, above.  However, Vitek had taken on an additional approximately €600 million in debt to J&T Group, which he failed to disclose to his "parity partner."

284.    Vitek not only failed to consult Investhold beforehand each time he took on new liabilities, and then failed to disclose these debts, he actively concealed debts owed to J&T Group from Investhold.  For example, Mr. Cmejla tried on numerous occasions during his monthly meetings with Vitek to ask about Vitek and CPI PG's relationship with J&T Group.

Vitek failed to answer honestly, instead repeatedly reassuring Mr. Cmejla that the only debt between CPI PG and J&T Group was the approximately €203 million that Investhold was aware of.  Further, even for the debt he did disclose to Investhold, Vitek failed to describe material details of the financing arrangements with J&T Group.  Without such information, Mr. Cmejla was unable to verify the full extent of Vitek's indebtedness to J&T Group, which, under the parity partnership, would affect his (and Mr. Divis's) interests.

285.    In or about June 2015, Investhold finally began to learn the true extent of the debt that Vitek had secretly taken on.  In particular, in July 2015, Mr. Cmejla obtained a document from the Chief Executive Officers of CPI PG, Martin Nemecek, which, to Mr. Cmejla's shock and dismay, reflected total debt from CPI PG to J&T Group of more than €600 million.

286.    It was only after Investhold learned this information from Nemecek that Vitek finally admitted to Mr. Cmejla that, in addition to the previously-disclosed €203 million in loans from J&T Group and Postova Banka, Vitek had caused CPI PG to take on further debts, and taken on debt personally, both without consulting Investhold Group, and that CPI PG and Vitek now owed an additional approximately €400 million in previously undisclosed debts to J&T Group entities.  Worse, Vitek revealed that the additional indebtedness was secured by various assets that had been acquired with J&T Banka's financing – which also had not been disclosed to Investhold – and that J&T Banka was pressuring Vitek to restructure CPI PG's collateral agreements in advance of the CEFC due diligence and to pledge CPI PG equity as collateral to secure Vitek's liabilities to J&T Group.

287.    In light of this startling admission, Mr. Cmejla requested financial documents that would permit Investhold to undertake its own audit of CPI PG's debts to J&T Banka.

288.    Vitek and CPI PG, however, refused to provide any financial information.

289.    Upon information and belief, the reason that Vitek and CPI PG refused to turn over financial statements and other audit documents to Investhold is that there were still additional, undisclosed debts from CPI PG to J&T Group totaling another approximately €200 million.

290.    These undisclosed liabilities were material to Vitek's and CPI PG's finances, and to Investhold's stake in CPI PG.  Moreover, a majority of these loans were illegitimate, and part of J&T Bank's complicity in Vitek's scheme.  For example, as set forth above, J&T Banka had provided financing used by Vitek to defraud Kingstown Capital when he looted ORCO for which J&T Banka received not only commercial fees but also illicit payments.  J&T Bank had also furnished shell companies and nominee owners and directors to assist Vitek in his scheme to secretly gain control of ORCO, and had served as a stalking horse for Vitek to acquire ORCO Germany (now known as CPI PG) at a drastically below-market price.

291.    Even as Vitek refused to provide financial information to Investhold, he urged it to agree to changes in the terms and conditions of the €203 million in loans, in preparation for consolidating all €600 million in loans, and then collateralize the consolidated €600 million debt with the CPI PG equity held by one or more of the four holding companies that were jointly owned by the "parity partners."

292.    Mr. Cmejla, furious that Vitek had failed to inform him of such significant debts and was still denying him or Investhold of either access to information or representation on CPI PG's board, rejected Vitek's entreaties.

293.    Vitek, however, was persistent. Vitek argued that allowing J&T Banka to take a security interest in the CPI PG equity was necessary in order not to lose J&T Group as a source of financing for future deals.   Heated discussions between Vitek and Mr. Cmejla ensued,

culminating in an argument on the rooftop of Quadrio (the Czech headquarters for CPI PG) in or about September 2015.

294.    The outcome of the rooftop argument was an agreement between Vitek and Investhold that J&T Group would be permitted to change the terms and conditions of the €203 million in loans provided by J&T Banka and Postova Banka such that they would be secured with CPI PG stock.  Specifically, under the new terms, the loans were to be repaid by Materali, a.s., with €203 million in financing from Vitek's company Ravento s.à r.l.  The Ravento loan was secured by CPI PG shares owned by the "parity partnership," effectively moving ownership of the stock from the partnership to an entity wholly-owned by Vitek.  Mr. Cmejla also consented to allow Vitek and J&T Group to carry out their agreement to first merge the remaining four "parity partnership" CPI PG holding companies – namely, Materali, a.s., Zacari, a.s., Rivaroli, a.s. and Lavagna, a.s. – into Zacari, a.s. (which was then renamed Rivaroli, a.s.), and then secure the newly-consolidated J&T Group debt with the CPI PG equity held by the new Rivaroli, a.s., which was still owned 50-50 by Vitek and Investhold as "parity partners."

295.    In return, Investhold would finally get its representative appointed to the CPI PG board of directors.  In addition, Vitek agreed to include Mr. Cmejla in all meetings with J&T Group.

296.    Moreover, it was agreed after this rooftop argument that the remaining debt that had been disclosed at that point, *i.e.*, approximately €400 million more, would not be collateralized by CPI PG stock without taking the time to conduct a proper analysis of the consequences or without a proper plan to make timely repayment.

297.    Mr. Cmejla agreed to these terms, in part, because Vitek assured him that this would be sufficient to placate J&T Group, and give Vitek time to negotiate better conditions with

J&T Group.  And, as set forth above, Vitek assured Mr. Cmejla that he could participate in those negotiations.

298.    Immediately following this agreement, Investhold again requested detailed information about the additional approximately €400 million in previously-undisclosed debt owed to J&T Group, and urged Vitek to organize weekly meetings between Mr. Cmejla and CPI PG management (including Martin Nemecek and Zdenek Havelka) to provide Investhold Group with disclosures regarding all of CPI PG's debts to J&T Group, so that Investhold Group could both thoroughly analyze whether CPI PG could repay its debts in time, and make plans to prevent the takeover of CPI PG by J&T Group should CPI PG fail to repay its debts to J&T Group when they came due.

299.    Vitek agreed to arrange these meetings with management, and to provide the requested financial information.  In fact, however, Vitek continued to allow only selective disclosures about CPI PG's true financial and operational picture to be made to Investhold.

300.    Between in or about September 2015 (following the rooftop argument) and the end of the year, notwithstanding their agreement, Vitek continued to urge Investhold to agree to collateralize the remainder of the debt owed to J&T Group with CPI PG equity. Vitek assured Mr. Cmejla that J&T Group would lower the interest rate on the debt as part of the restructuring, and would be flexible on repayment terms.

301.    In or around December 2015, Vitek informed Mr. Cmejla that the total debt to J&T Group was actually approximately €800 million, that is, that there was an additional approximately €200 million in previously undisclosed debt.  This undisclosed debt was and is material to the finances of CPI PG, and Vitek's fraudulent scheme to saddle CPI PG with this

debt (the proceeds of which he used for his own benefit) and then to hide it had the effect of substantially diminishing CPI PG's value.

302.     But by hiding, and then selectively and gradually disclosing his J&T Group debts, Vitek induced Investhold to continue their "parity partnership." Had Investhold received a full accounting of Vitek's debts as well as information about the material financial terms of those loans, Investhold Group would have exercised its conversion rights and blocked Vitek's efforts to dilute Investhold's interest in CPI PG.

### T.      Despite Agreeing To Provide Complete Information, Vitek Continues To Hide CPI PG's Debts

303.     Starting in or about January 2016, pursuant to their agreement, Mr. Cmejla began to regularly request to attend Vitek's meetings with J&T Banka.  While Vitek repeatedly assured Mr. Cmejla that he would honor his agreement to allow Mr. Cmejla to attend such meetings – and in general would honor the terms of their "parity partnership" – Vitek failed to do so.

304.     For example, in several instances, Vitek informed Mr. Cmejla of the meeting after the fact, and assured Mr. Cmejla that he could attend the next meeting. Another time, Vitek informed Mr. Cmejla of a meeting at the last minute, knowing that Mr. Cmejla would be unable to attend on short notice.

305.     For a period of time following the September 2015 rooftop meeting, Mr. Cmejla met regularly with CPI PG's executives, although he did not receive access to all of the financial information he requested.  In or around February 2016, however, CPI PG management informed Mr. Cmejla that Vitek had directed them to cease their regular meetings. Vitek then told Mr. Cmejla that he had decided to end those regular meetings because CPI PG management had become too busy to spend time and effort preparing and presenting information for Mr. Cmejla and Investhold Group.

306.     Upon information and belief, the real reason that Vitek ended these meetings was to ensure that Investhold Group did not receive material portions of the financial information that Mr. Cmejla had demanded regarding the debts owed to J&T Group.

**U.     Vitek Exploits His Control Over CPI PG To Defraud Investhold**

307.     In or around March 2016, Mr. Cmejla put his foot down and demanded that he be permitted to meet with J&T Banka, which, as described above, was well aware of the "parity partnership" between Vitek and Investhold.  In response, Vitek flatly refused, telling Mr. Cmejla that his presence at the meetings would be "strange" and "not helpful."

308.     On or around March 23, 2016, the four "parity partnership" holding companies completed their merger, after which the parity partners held their collective interest in CPI PG through Rivaroli, a.s., in which Vitek and Investhold each had a 50% stake.

309.     In or around the first week of April 2016, Mr. Cmejla learned that Vitek was negotiating an agreement with J&T Group to collateralize the full €800 million in outstanding debt using all of the CPI PG equity held by Rivaroli, a.s., which was in turn owned 50-50 by Vitek and Investhold Group.

310.     According to the preliminary terms Vitek had agreed on with J&T Group, all J&T Group loans were supposed to be consolidated into a single loan maturing in July 2017 in a few tranches over the course of 2016, secured by newly issued CPI PG shares subscribed to by a new holding company, Ravento s.à r.l. (with Vitek as ultimate beneficial owner).  For each tranche, Ravento would have concluded a call option purchase agreement with Rivaroli, a.s. under which Rivaroli would have had the right to purchase all of the newly issued CPI PG shares under certain conditions, chiefly the payment of an agreed-upon purchase price.  If the loans were not fully paid off at their approximately one-year maturity, J&T Group would automatically gain full

control of Ravento, s.à r.l., which in turn would have taken most of the parity partnership's more-than-90% interest in CPI PG.

311.    Given that CPI PG's annual net proceeds were approximately €200 million at that time, this arrangement was designed to fail.

312.    Contrary to Vitek's repeated assurances that he wished to remain in a "parity partnership" with Investhold Group, Vitek in fact intended for CPI PG to default on this loan and for his accomplices at J&T Group to then seize CPI PG's equity.

313.    Once he learned about the proposed deal that Vitek had "negotiated" with J&T Group, Mr. Cmejla understood that there was no way that CPI PG could pay off the entire balance by the time the loan came due, and that if the deal went through, J&T Banka would inevitably foreclose on all of the CPI PG equity held by Rivaroli, a.s.

314.    Mr. Cmejla, on behalf of Investhold Group, therefore refused to consent to any further pledge of CPI PG equity to J&T Group. Without Investhold Group's consent, Vitek should not have been able to pledge the remainder of the equity held by Rivaroli, a.s., which was jointly owned and controlled by the parity partnership.

315.    Because Investhold was properly represented on the board of the holding company Rivaroli, a.s., Investhold was able to stop Vitek from pledging its CPI PG equity to J&T Banka.  But Vitek had never honored his promise, which he reiterated after the September 2015 rooftop argument, to allow Investhold to be represented on CPI PG's board.  Therefore, Investhold was not be able to stop Vitek from authorizing a huge new capital increase in CPI PG followed by the pledge of the newly-issued CPI PG shares to J&T Group.  That pledge was made by various newly-subscribed shareholders that were controlled solely by Vitek (such as Ravento s.à r.l., Efimacor s.à r.l., and Rindostern s.à r.l.).

316.    Accordingly, when in or about April 2016, Vitek – who had utter control over CPI PG's board – decided to ignore the objections of Mr. Cmejla and to enter into the new agreements with J&T Group, Investhold was not able to stop him.  After Vitek announced to Mr. Cmejla and Mr. Divis that he was entering into the agreements with J&T Group without their consent, Mr. Cmejla and Mr. Divis became furious and immediately terminated their parity partnership.  Vitek then caused CPI PG to begin to issue new shares to new entities controlled solely by him through his nominees.  Those newly-issued shares were then pledged to J&T Group to secure all of CPI PG's debts.  There was nothing that Investhold could do to stop him. As discussed in more detail below, the effect of these new issuances was to dilute the stake in CPI PG held by Rivaroli, a.s. to approximately an 8% stake after all of the new issuances securing CPI PG's debts to J&T Group were complete by the end of 2016.  Thus, as a result of Vitek's scheme, Investhold's indirect interest in CPI PG decreased to approximately 4%.

317.    This maneuver – which was a direct result of Vitek denying Investhold representation on CPI PG's board or access to accurate financial information – had the duel effect of massively diluting Investhold's indirect interest in CPI PG (through its 50% ownership of Rivaroli, a.s.), and effecting Vitek's scheme to allow J&T Group to effectively seize control of CPI PG.

### V.    Investhold and Vitek Terminate the "Parity Partnership," and Vitek Defrauds Investhold Again

318.    Upon discovering Vitek's actions, Mr. Cmejla and Mr. Divis were enraged.  Not only had Vitek used his control over CPI PG to circumvent Investhold's ability to influence major corporate decisions, but he had used that control to injure Investhold by diluting its indirect stake in CPI PG.  Moreover, Vitek violated the terms of the "parity partnership" when he caused CPI PG to issue new stock for his own benefit, without giving half to Investhold.

74

319.     As a result of this clear breach of the letter and spirit of their "parity partnership," Investhold informed Vitek that it wished to terminate their relationship.

320.     On or about April 30, 2016, Vitek reached an agreement with Mr. Cmejla and Mr. Divis to terminate their "parity partnership" and unwind their relationship (the "Buyout Agreement").  Under the terms of this Buyout Agreement, Vitek agreed to pay Investhold the value of its interest in the partnership, which the parties agreed to value at 13 billion Czech koruna, or approximately $570 million at the time.

321.     Vitek claimed not to be able to pay so much immediately, however.  As a result, the buyout payment was structured as a mixture of 5 billion Czech koruna in cash, which was in the form of a five-year loan with annual interest payments of 7%, and hard assets.

322.     Specifically, Investhold agreed that it would accept a portion of the buyout payment in the form of a portfolio of residential properties held by a subsidiary of Czech Property Investments, CPI Byty, a.s. ("CPI Byty").  CPI Byty's assets would be valued by an independent appraisal, and that valuation would be used for the purposes of the Buyout Agreement, with the remaining 5 billion koruna (out of the 13 billion koruna total) to be paid in cash, with interest at a rate of 7% annually over five years.  The loan was structured so that only the interest payment was due annually (or approximately 350 million Czech koruna per year), with the entire principle due at maturity.

323.     The net value of CPI Byty's assets was later assessed to be 8 billion Czech koruna.

324.     Vitek claimed that he was unable to transfer CPI Byty's assets or equity immediately, however, as the equity was subject to covenants in bonds held by Raiffeisen Bank, which, among other things, prohibited a change in control.

325.     As a result, Investhold received neither cash nor assets at the time that it agreed to the Buyout Agreement.  In an effort to lull Investhold, however, Vitek purported to allow Investhold to manage the day-to-day operations of CPI Byty as if it already belonged to Investhold.  To that end, Vitek agreed that the top managers of CPI Byty, Zdenek Havelka and David Stybr, would meet weekly with representatives of Investhold Group, and further agreed to appoint a law firm with a close and ongoing relationship with Mr. Cmejla to serve as legal counsel to CPI Byty.

326.     In fact, Vitek never intended to fulfil the terms of the Buyout Agreement.  Rather, the Buyout Agreement was another effort by Vitek to stall Investhold so that he could take further steps to misappropriate the proceeds of their joint investments for himself.

### W.     Vitek Completes His Takeover of CPI PG

327.     Having kept Investhold at bay with the Buyout Agreement, Vitek went forward with causing CPI PG to issue new shares in several tranches – starting on or about April 21, 2016 – in order to secure CPI PG debts to J&T Group.  Before the first capital increase on or about April 21, 2016, the registered capital of CPI PG was represented by 3,303,768,300 shares with the nominal value of €0.10 per share.  After the latest capital increase on November 5, 2018, the registered capital of CPI PG is represented by 9,013,868,658 shares with the nominal value of €0.10 per share, almost three times the number of shares existing before the first of these capital increases undertaken to secure CPI PG's debts to J&T Group.  The new subscriptions of CPI PG shares were executed mostly by the entities controlled by Vitek (Ravento, s.à r.l., Efimacor s.à r.l. and Rindostern s.à r.l.) and by Misoman Industry Limited, a Cypriot company purportedly acting independently from Vitek and nominally owned by Marek Galvas (a J&T Group manager), but which, upon information and belief, is controlled by Vitek.  As of the filing of this Complaint, Vitek officially holds 94.25% of voting rights in CPI PG.  However, unofficially,

Vitek caused the newly-issued equity to be pledged as security for J&T Group's loans.  The value of the new equity was approximately €2.4 billion, which is about three times the debt it secured.

328.    As Vitek had originally proposed, under the restructured debt agreement with J&T Group, CPI PG's loans matured in June 2017, at which time J&T Banka would take control of all the shares securing its debt.

329.    There was no legitimate business reason to give J&T Group such a large security interest. Rather, Vitek agreed to these terms in order to ensure that CPI PG would be owned by entities in which Investhold had no interest and ultimately foreclosed upon by J&T Banka for its and his own benefit.

330.    Following the issuance and registration of the new CPI PG shares, the stake in CPI PG that was owned by Rivaroli, a.s. (of which Investhold had a 50% interest) was diluted down to approximately an 8% stake.  Thus, as a result of Vitek's scheme, Investhold's indirect interest in CPI PG was approximately 4%.

### X.    Vitek Completes His Takeover of ORCO

331.    In or about May 2016, Vitek caused ORCO to engage in another dilutive share issuance, which was subscribed to by Fetumar Development Limited, Aspley Ventures Limited, and Jagapa Limited.

332.    As set forth above, Fetumar was nominally owned by defendant Jan Gerner. Aspley was nominally owned by defendant Pavel Spanko.  And Jagapa was nominally owned by defendant Julius Strapek.  In truth and in fact, however, Fetumar, Aspley, and Jagapa were controlled by Vitek, who was the true beneficial owner of their shares of ORCO.

333.    Following the May 10, 2016 new share issuance, Fetumar, Aspley, and Jagapa each held 30.43% of ORCO, for a combined total of 91.29% of ORCO.

334.     With this capital increase, ORCO raised in total €80,000,000 upon the issuance of 1,000,000,000 new ordinary shares at a subscription price €0.08 per share.  As a consequence of this capital increase, the total number of ORCO shares numbered 1,314,507,629 – an increase of 1,000,000,000 shares, meaning that Aspley Ventures Limited paid €24,000,000 to subscribe to 300,000,000 new OPG shares, Fetumar Development Limited paid €24,000,000 to subscribe to 300,000,000 new OPG shares, and Jagapa Limited paid €32,000,000 to subscribe to 400,000,000 new OPG shares.

335.     On or about June 8, 2016, a wholly owned subsidiary of CPI PG, Nukasso Limited, acquired Fetumar, Aspley, and Jagapa on undisclosed terms.

336.     Combined with the shares Nukasso Limited already held, Nukasso – and therefore CPI PG, and therefore Vitek – held 97.31% of ORCO's shares following the June 2016 transactions.

337.     From at least on or about January 11, 2013, up to and including at least June 8, 2016, Vitek, along with Ott, were in continual violation of the Takeover Bids Act's compulsory acquisition offer requirement.

338.     On August 23, 2016, following the acquisition of ORCO by CPI PG, CPI PG obtained merger clearance for the acquisition of ORCO from the Czech Office for the Protection of Competition.

### Y.     Vitek Breaches the Buyout Agreement – Which He Never Intended To Honor

339.     In or about April 2017, Vitek made a partial payment to Investhold Group of the loan interest due under the Buyout Agreement, in the amount of 250 million Czech koruna (approximately $10 million), out of the 350 million due. Vitek made this payment to placate

Investhold so that Vitek could finish executing his fraudulent scheme and complete his utter takeover of all of the valuable assets of the "parity partnership."

340.    In or about November 2017, Vitek removed Marek Cmejla's trusted law firm as counsel to CPI Byty.  At that time, Vitek had still failed to formalize Investhold's right to obtain the equity or assets of CPI Byty, as required under the Buyout Agreement.

341.    On or about December 4, 2017, Messrs. Cmejla and Divis sent a letter on behalf of Investhold Group to Vitek and CPI PG, informing them that Vitek's removal of the law firm as counsel to CPI Byty would be considered a breach of the Buyout Agreement that, if not cured, would be understood as a cancellation of the Buyout Agreement by Vitek and would force Investhold Group to assert its prior rights under the "parity partnership," which would include an objection to the unjustified dilution of its stake in CPI PG.

342.    Vitek did not restore the law firm as counsel to CPI Byty.

343.    In or about April 2018, on the second anniversary of their Buyout Agreement, when Vitek's second annual interest payment was due, Vitek failed to make any payment to Investhold.  Other than the 250 million Czech koruna payment in or about April 2017, Vitek never made any payment or transferred any assets to Investhold under the Buyout Agreement.

**Z.    Vitek and Ott Come Under Investigation And Are Found To Have Repeatedly Violated European and Local Law**

344.    Some of the fraudulent conduct alleged in this complaint has been the subject of investigation and adverse rulings by foreign regulators, including the Luxembourg financial regulator known as the Commission de Surveillance du Secteur Financier ("CSSF").

345.    The CSSF launched an investigation of Vitek's and Ott's conduct during the period of September 1, 2012 and June 30, 2016, when Vitek orchestrated his illegal takeover of ORCO Germany, among other things.

346.    On or about December 8, 2017, the CSSF found that Vitek and Ott illegally acted in covert concert during that period, and therefore were considered to have jointly controlled over a third of ORCO as early as January 10-11, 2013.

347.    CSSF's finding meant that Vitek and Ott's joint control surpassed the 33.33% threshold under the Takeover Bids Act as of mid-January 2013, and therefore they were obligated to make an acquisition offer to other shareholders as of that date. However, no takeover bid was made until June 8, 2016.  As set forth above, at that time, more than 90% of ORCO's stock was already effectively owned by Vitek through Fetumar, Aspley, and Jagapa.

348.    In December 2017, CSSF found that two of those entities, Fetumar and Aspley, had been controlled by associates of Vitek when they acquired over 30% each of ORCO in November 2014.  At that time, Vitek had direct control of 11.2% of ORCO, and, through Ott, indirect control of another 3.5%. Due to the CSSF's finding that Fetumar and Aspley (as well as Ott) were all working in concert with Vitek as of November 2014, their aggregate ownership of ORCO gave them absolute control of the company.

349.    The December 2017 CSSF decision also found that Jagapa, which subscribed to a further ORCO capital increase in May 2016, was also effectively controlled by Vitek. The May 2016 capital issuance resulted in Fetumar, Aspley, and Jagapa each holding 30.43% of ORCO (for a combined stake in ORCO of 91.29%).

350.    According to the CSSF, on June 8, 2016, as set forth above, CPI PG acquired a 97.31% interest in ORCO, largely through the simultaneous acquisition by CPI PG of Fetumar, Aspley, and Jagapa (through Nukasso Limited, CPI PG's wholly-owned Cypriot subsidiary).

351.    The CSSF's December 2017 decision held that Vitek and Ott's failure to make a mandatory takeover bid in January 2013, when they first passed the statutory threshold, constituted a violation of Article 5(1) of the Takeover Bids Act.

352.    As a result of its findings, the CSSF suspended trading in ORCO shares on the Luxembourg stock exchange and fined Vitek.

353.    Vitek has been investigated for similar violations by other regulators.

354.    For example, in or about October 2015, Vitek caused CPI PG to acquire two entities with interests in the Crans-Montana ski resort, located in the Crans-Montana region of Switzerland: Remontees Mecaniques Crans-Montana-Aminona SA ("CMA SA") and CMA Immobilier SA ("Immobilier"). CPI PG initially acquired 65.83% of CMA SA and 88.49% of Immobilier; most of the remaining shares of Immobilier were owned by CMA SA, giving CPI PG a combined stake of 99.7% in Immobilier.

355.    At the time of this acquisition, approximately 29% of CMA SA was owned by local municipalities and communes in Switzerland.

356.    On or about December 5, 2016, Vitek used CPI PG's controlling interest in CMA SA to order a capital augmentation, issuing new shares. CPI PG bought a majority of these new shares, increasing its ownership in CMA SA to approximately 85%. In the process, the communes' collective interest was reduced to around 10%, diluting them to almost a third of their prior stake.

357.    On the same day, CMA SA used over 35 million Swiss francs from the proceeds of the capital augmentation to acquire a greater stake in Immobilier from CPI PG. Such a major acquisition of assets from a shareholder by means of a capital increase is a violation of the Swiss Code of Obligations.

358.     In or about June 2017, CMA SA shareholders discovered that, according to the company's own books, it had overpaid for its increased stake in Immobilier by 28 million Swiss francs.

359.     The local municipal authorities commissioned a secret audit of the CMA SA capital augmentation and related transactions. The Geneva law firm that conducted the audit reported that the December 2016 transactions constituted potentially criminal acts of misappropriation, document forgery, fraudulent declarations, and illegal and unfair management by the members of the board of CMA SA.  CPI PG, as a major shareholder, named a representative to the CMA SA board, Phillipe Magistretti. Magistretti has also been a member of the CPI PG board since May 2014.

360.     Though they were obligated to report such potential crimes, the local municipal leaders were reluctant to report them for fear that it would harm tourism in the region. Indeed, in 2018, around Easter, Magistretti caused CMA SA to close its ski lifts, disrupting tourist activity in the region.  Upon information and belief, Magistretti would not have done so except on Vitek's direct orders.

361.     Moreover, since the General Assembly revealed the result of the secret audit of the transaction, Magistretti has sent letters to an organization that planned to host the Alpine Skiing Ladies World Cup at the resort in February 2019, indicating that CMA SA could not promise that the ski lifts would be operational at that time.  Upon information and belief, these letters were a veiled threat, designed to dissuade the local municipal leaders from filing a lawsuit and/or criminal complaint against Vitek.

362.    The results of the secret audit finally became public and were reported in the press by October 2018. By November 2018, the Swiss public prosecutor sent a letter to the communes informing them of their obligation to report such crimes.

363.    Following these public reports, Nicolas Féraud, the president of the Crans-Montana commune announced that he was not willing to be held hostage by CMA SA threats, and stated that he would pursue a civil action against Vitek.

## FIRST CAUSE OF ACTION

### Violations of RICO, 18 U.S.C. § 1962(c)
### (Against CPI Property Group, S.A.; J&T Banka, A.S.; Postova Banka, A.S.; Jean-François Ott; and Radovan Vitek)

364.    Plaintiffs repeat and reallege paragraphs 1 through 363 as if fully set forth herein.

365.    This cause of action is asserted against CPI Property Group, S.A.; J&T Banka, A.S.; Postova Banka, A.S.; Jean-François Ott; and Radovan Vitek (the "Count 1 Defendants") and is asserted in addition to and in the alternative to the other RICO Causes of Action.

366.    Section 1962(c) of Title 18 of the U.S. Code makes it illegal for "any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt."

367.    Each Count 1 Defendant is a "person" capable of holding legal or beneficial interest in property within the meaning of 18 U.S.C. § 1961(3).

368.    Each Count 1 Defendant violated 18 U.S.C. § 1962(c) by the acts described in the prior paragraphs, and as further described below.

### (a)    The Count 1 Enterprise: An Association in Fact

369.    The Count 1 Defendants, along with defendants Jan Gerner, Milada Mala, Lumir Safranek, Pavel Spanko, and Julius Strapek, and non-parties ORCO and Czech Property

Investments, along with others known and unknown, form an association in fact for the common and continuing purpose described herein and constitute an enterprise within the meaning of 18 U.S.C. § 1961(4) engaged in the conduct of their affairs through a continuing pattern of racketeering activity (the "Count 1 Enterprise"). The members of the enterprise function as a continuing unit with an ascertainable structure separate and distinct from that of the conduct of the pattern of racketeering activity.

370.    The Count 1 Enterprise is structured through (1) the personal and financial relationships between Vitek, on the one hand, and each of the other members of the Count 1 Enterprise, on the other hand; (2) Vitek's, Ms. Mala's, Ott's, Jan Gerner's, Lumir Safranek's, Julius Strapek's, and Pavel Spanko's management of and/or direct or indirect ownership interest in CPI PG and CPI PG's affiliates, ORCO and Czech Property Investments; and (3) the financing and loans used to acquire assets of CPI PG and its affiliates that were provided to J&T Banka and Postova Banka, as well as other companies nominally owned by Ms. Mala, Ott, Jan Gerner, Lumir Safranek, Pavel Spanko, and Julius Strapek. Although the precise composition of the Count 1 Enterprise changed over time, including through name changes of the companies involved, the overall character and purpose of the Count 1 Enterprise was consistent.

371.    The Count 1 Enterprise was, and is, distinct from each of the Count 1 Defendants. The Count 1 Enterprise was formed for the purpose of facilitating, committing, perpetuating, and concealing the fraudulent and other criminal conduct alleged herein. The aim of the Count 1 Enterprise's unlawful conduct was to deprive other direct and indirect investors and owners of CPI PG, ORCO, and their affiliates of the profits and other benefits those individuals and entities would have otherwise obtained. The Count 1 Enterprise enabled each of the Count 1 Defendants

to provide outward appearances of independence and legitimate financial dealings while concealing their coordination and true relationships.

372.    The Count 1 Enterprise has engaged in, and its activities have affected, foreign and interstate commerce, including through transactions with individuals and business entities located in states or nations other than those in which the Count 1 Defendants operated, including the United States. The Count 1 Enterprise has directly and foreseeably affected commerce in the United States through the involvement of U.S. financial institutions and individuals in the affairs of CPI PG, ORCO, and their affiliates, including through contractual arrangements, wire transfers and communications, money laundering, and inducements to travel.

**(b)    Pattern of Racketeering Activity**

373.    The Count 1 Defendants, each of whom are persons associated with the Count 1 Enterprise, did knowingly, willfully and unlawfully conduct or participate, directly or indirectly, in the affairs of the enterprise through a pattern of racketeering activity within the meaning of 18 U.S.C. § 1961(5). Each Count 1 Defendant committed multiple predicate acts of racketeering that are indictable under the provisions of the U.S. Code enumerated in 18 U.S.C. § 1961(1)(B), as more specifically alleged below. Defendants each committed, or conspired with or aided and abetted other Defendants in committing, at least two such acts.

374.    The Count 1 Defendants played the following roles in the racketeering scheme:

a.    CPI PG, previously known as ORCO Germany, was a subsidiary of ORCO and later the parent of Czech Property Investments, a.s. Directly and through its agent officers, directors, board members, employees, and representatives – each acting within the scope of their employment – CPI PG has been an active participant and central figure in the racketeering scheme to steal assets from the Plaintiffs and to hold the ill-gotten gains of the Count 1 Enterprise.

b.      Vitek was, from the inception of the Count 1 Enterprise through to the present, the principal architect of the scheme. He is a director and indirect majority shareholder of CPI PG and its now-subsidiary Czech Property Investments. Through his personal and financial relationships with the other members of the Count 1 Enterprise, Vitek had ultimate executive authority over the decisions of the other members of the Count 1 Enterprise relating to the scheme and the terms of transactions entered into by them, as described in this complaint. Vitek had knowledge of the various undisclosed connections between the members of the Count 1 Enterprise that were integral to the scheme and orchestrated the acts of the other members of the Count 1 Enterprise. As set forth below, as a participant in the scheme to defraud, Vitek committed and aided and abetted acts of mail and wire fraud, money laundering, and fraudulent inducements to travel in violation of 18 U.S.C. §§ 1341, 1343, 1956, 1957, and 2314, in connection with his schemes to loot ORCO assets and gain control over ORCO's board of directors. Vitek arranged for phony entities that would vote their shares on Vitek's behalf, caused ORCO to sell valuable assets at mismarked or steeply discounted prices, and defrauded Plaintiffs out of the profits they were entitled to under their agreements with the Count 1 Defendants and the proceeds of their investments in ORCO, CPI PG, and affiliates.

c.      Ott is the founder and former CEO of ORCO, the owner of Stationway Properties Limited, and was at relevant times an officer and director of both ORCO and CPI PG. Ott met or communicated through interstate wires with the Plaintiffs on multiple different occasions throughout the conspiracy. In connection with the anticipated restructuring of ORCO, Ott misled the Kingstown Capital Plaintiffs and induced one of its board members to travel to London and Paris in connection with the scheme. Ott

falsely represented that he was acting independently of Vitek and the other members of the Count 1 Enterprise, while he was in fact coordinating with them and holding assets on their behalf. Ott facilitated the sale of CPI PG and ORCO assets at below-market value. In return for his participation in the scheme to defraud Plaintiffs, Vitek allowed Ott to remain as CEO of ORCO and then paid Ott a parachute payment that included millions of dollars in cash and real estate to which Ott was not entitled. As set forth below, as a participant in the scheme to defraud, Ott committed and aided and abetted acts of mail and wire fraud, money laundering, and fraudulent inducements to travel in violation of 18 U.S.C. §§ 1341, 1343, 1956, 1957, and 2314, in connection with his misrepresentations to Kingstown Capital regarding the management and oversight of ORCO, and his concealment of Vitek's true ownership interests.

        d.      J&T Banka and its affiliate Postova Banka provided financing for the scheme, including through loans and other debt issued by Czech Property Investments, a.s., and CPI PG. J&T Banka brokered the sham sale of ORCO assets to the Endurance real estate funds. As set forth below, as a participant in the scheme to defraud, J&T Banka and Postova Banka committed and aided and abetted acts of mail and wire fraud and money laundering in violation of 18 U.S.C. §§ 1341, 1343, 1956, and 1957, in connection with its conspiracy with Vitek to finance his looting of the assets of ORCO, and to structure that financing in a manner intended to evade Czech and European banking laws and to conceal its affiliation with Vitek. J&T Banka served as Vitek's broker and provided him with entities to serve as straw purchasers. In exchange, Vitek agreed to pledge the assets he acquired with J&T Banka's help as security and to pay J&T Banka high interest rates.

375.     The Count 1 Defendants' acts of racketeering were not isolated but rather were related in that they were all committed for the purpose of concealing or obfuscating the true ownership and sources of funding for the actions of the members of the Count 1 Enterprise. By their fraudulent acts, the Count 1 Defendants were able to deprive the Plaintiffs of their property interests in CPI PG, ORCO, and affiliates, and to forestall remedial litigation by the Plaintiffs by means of Vitek's and Ott's duplicitous interactions with them. These acts, and others to be identified after further investigation and discovery, also shared a common or related result, participants, victim, and method of commission, which are described below.

376.     Defendants' violations of state and federal law as set forth herein, each of which directly and proximately injured Plaintiffs, constituted a continuous course of conduct spanning a period from approximately mid-2012 through the present, which was intended to obtain money and assets through false representations, fraud, deceit, and other improper and unlawful means. Therefore, said violations were a part of a pattern of racketeering activity under 18 U.S.C. §§ 1961(1) and (5).

**(c)     RICO Predicate Acts**

377.      Each of the Count 1 Defendants committed and aided and abetted the predicate acts described below in order to further the objectives of the Count 1 Enterprise.

378.     Vitek and Ott committed and aided and abetted the predicate acts described below in their individual capacity or through their direct or indirect corporate or executive control of CPI PG, ORCO, and affiliates. Vitek and Ott, through their control of and/or participation in CPI PG, ORCO, and affiliates, committed numerous predicate acts, or acted with knowledge that predicate acts would follow in the ordinary operation of CPI PG, ORCO, and affiliates, or could reasonably have foreseen that predicate acts would be used in the ordinary course of business as a result of Vitek's and Ott's actions in furtherance of the Count 1 Enterprise.

379.     The predicate acts by CPI PG, J&T Banka, and Postova Banka were committed by representatives of those entities acting within the scope of their employment and for the benefit of those entities. Because of their relationship with Vitek and Ott, and the coordination of their activities by Vitek and Ott, CPI PG, J&T Banka, and Postova Banka committed the predicate acts described below to further the aims of the Count 1 Enterprise. The actions of CPI PG include those committed by CPI PG while under its prior names, ORCO Germany and GSG Group, as described further below.

### (i)     Mail and Wire Fraud in Violation of 18 U.S.C. §§ 1341 and 1343.

380.     In furtherance of the scheme, and as described herein, the Count 1 Defendants transmitted, or caused to be transmitted, by means of wire communication in interstate or foreign commerce, writings, signs, signals, pictures, and sounds, in violation of 18 U.S.C. § 1343; and also caused matters and things to be placed in a post office or authorized depository or deposited or caused to be deposited matters or things to be sent or delivered by a private or commercial interstate carrier in violation of 18 U.S.C. § 1341. The Count 1 Defendants' specific mailings and interstate wirings in furtherance of the scheme to defraud include, but are not limited to, the following:

a.     Ott called Kingstown Capital's representative in New York City shortly after Stationway Properties Limited purchased ORCO shares on January 11, 2013, and falsely represented that he used his own money to purchase the ORCO shares held by Stationway Properties Limited and did so out of a sense of "moral duty" to fend off Vitek from controlling ORCO. *See* ¶¶ 105-107. Ott made this false and material representation by means of U.S. wire communications, between himself and Kingstown Capital. Ott knew that Kingstown Capital is located in New York City.

b.      Following Ott's meeting with Kingstown Capital's representative in New York City in or about February 2013, Ott made multiple communications over U.S. wires directed at Kingstown Capital in New York City, each time falsely representing that he did not want Vitek to have control of ORCO. *See* ¶ 116.

c.      On or about February 25, 2013, Vitek and Ott, aided and abetted by J&T Banka, caused ORCO to transmit the minutes from the ORCO Board of Directors meetings that occurred on January 25 and 29, 2013, to Kingstown Capital in New York. The minutes, along with the Endurance Office Sub-fund disposal memo attached to those minutes, misled Plaintiffs concerning the reasoning behind and the terms for disposing of ORCO's interest in the Endurance Office Sub-fund. *See* ¶¶ 136-140. Vitek and Ott knew that Tommasini would disseminate the Endurance Office Sub-fund disposal memo to Kingstown Capital via U.S. wire communications directed at Kingstown Capital in New York City.

d.      Vitek and Ott, directly or through representatives of ORCO, caused further fraudulent wire communications – including the transmittal of fraudulent board agenda and minutes, and teleconference calls to New York City – to be made in connection with ORCO Board of Directors meetings held on March 28, 2013, April 24, 2013, May 15, 2013, August 29, 2013, November 27 and 29, 2013, and December 20, 2013, each constituting separate predicate acts of wire fraud. *See* ¶¶ 144, 181-83, 204-209. Vitek and Ott knew that Tommasini would transmit altered minutes over U.S. wire communications directed to Kingstown Capital in New York City. The transmission of these altered minutes and Vitek's and Ott's misrepresentations on the teleconference board meetings were in furtherance of the Count 1 Defendant's fraudulent scheme, including by

90

preventing discovery of Vitek's secret control of the ORCO Board of Directors. The Count 1 Defendants also knew that their invitations to attend meetings, agenda items, and other arrangements for board meetings would be conducted using U.S. wire communications.

e.     On a January 14, 2014, conference call with representatives of Kingstown Capital and Alchemy, among others, Vitek misrepresented his relationship with Ott and the management and performance of ORCO. Vitek omitted that he was working closely and in coordination with Ott, including that he had been directing Ott's actions in connection with ORCO as of late 2012. Vitek also misrepresented the terms under which ORCO could make parachute payments to outgoing management. The parachute payment provision called for payments to be made only upon a change of control. While Vitek actively ensured that there was no official change in control at ORCO, he nevertheless later allowed ORCO to make the parachute payments in order to pay off Ott. By failing to disclose his affiliation with Ott, and by mischaracterizing the parachute payment provisions, Vitek misrepresented his ability to prevent the parachute payments, simply by insisting on their terms. He also obscured his reason for failing to prevent the payment of the parachute payments: To buy off Ott upon his termination in March 2014. *See* ¶¶ 235, 239.

f.     On or about January 24, 2014, Vitek misrepresented ORCO's performance and falsely stated that ORCO was plagued by poison pills and massive unbooked liabilities. Vitek's statements were misleading because he had engineered ORCO's financial problems in furtherance of the scheme to defraud. Further, Vitek had effective control over management for over a year, and thus any unbooked liabilities were his own

responsibility, if they even existed. Vitek's caused these statements to be published, knowing they would be transmitted to United States, including to Kingstown, over U.S. wire communications. *See* ¶ 236. Vitek's representations were materially misleading, and were transmitted to, and had an effect on, Kingstown Capital and others in the United States over U.S. wire communications. The statements failed to disclose Vitek's own role and responsibility for placing ORCO in the position where it was financially unstable.

381.    To the extent proof of reliance is legally required, in engaging in the aforementioned mail and wire fraud, the Count 1 Defendants knew and intended that Plaintiffs and others would reasonably rely on the Count 1 Defendants' misrepresentations and omissions, which would result in the members of the Count 1 Enterprise obtaining and retaining interests in property to which they were not entitled and which would have otherwise been secured by Plaintiffs.

**(ii)    Money Laundering in Violation of 18 U.S.C. §§ 1956 and 1957.**

382.    The Count 1 Defendants each committed and aided and abetted acts of money laundering in violation of 18 U.S.C. §§ 1956 and 1957 in connection with the scheme to conceal the true relationships among the members of the Count 1 Enterprise. The Count 1 Defendants' violations of the other predicate acts constituted specified unlawful activity within the meaning of 18 U.S.C. §§ 1956 and 1957.

383.    Vitek concealed the source of funding for and ownership of entities involved in the racketeering scheme by paying nominees, having them take out loans, or promising them kickbacks, to acquire shares of ORCO and affiliates and then act in concert with Vitek to loot the assets of those companies. For example, Vitek and J&T Banka hid the source of the funds used to purchase the Stationway shares, and thereby concealed the illicit purpose for which those funds were being used. Vitek repeatedly used shell companies to hide his effective control of a

greater portion of ORCO than was allowed under the Takeover Bids Act, and to avoid alerting other shareholders to the true value of ORCO's assets, and his ability, and intent, to loot ORCO of those assets.

384.    Ott was aware that Vitek and J&T Banka hid the source of funds used to purchase the Stationway shares, and knew that Vitek intended to use these funds to loot and eventually takeover of ORCO in violation of European and local law, including the Takeover Bids Act. Ott's misrepresentations to Kingstown Capital over U.S. wire communications on or after January 12, 2013 furthered Vitek's laundering of the money used to purchase Stationway Property Limited's shares. Ott was aware that Vitek had arranged for the funds (provided by J&T Banka) that were used to purchase Stationway Property Limited's shares to hide the source of funds used to purchase those shares, and that those funds would be used for an illicit purpose, namely, to evade regulatory requirements under the Takeover Bids Act and to loot ORCO assets. Ott participated in Vitek's money laundering in order to further Vitek's fraudulent scheme to defraud Kingstown Capital, and later, the other Plaintiffs.

385.    Vitek and Ott, with funds provided by J&T Banka and Postova Banka, continued this pattern of money laundering in subsequent transactions. In addition to the Stationway Property transactions, the Count 1 Defendants concealed the true ownership and source of funding behind at least the following transactions:

a.    the June 3, 2013 purchase by Kamoro Limited of an ownership interest in ORCO Germany;

b.    the June 6, 2013 purchase by Sidoti of the Endurance Office sub-funds' real estate assets;

c.      the late 2013 acquisition by Tandis of an ownership interest in ORCO Germany;

d.      the June 2014 purchase of ORCO Germany shares by entities under Vitek's covert control;

e.      the November 2014 purchase of ORCO shares by Fetumar Development Limited and Aspley Ventures Limited;

f.      the May 2016 purchase of ORCO shares by Fetumar Development Limited, Aspley Ventures Limited, and Jagapa Limited.

386.    In exchange for his participation in conducting the affairs of the Count 1 Enterprise, Ott continued to receive compensation as CEO of ORCO until March 2014, and then received an unjustifiable parachute payment from ORCO in cash and real estate. The parachute payment was worth a combined value of no less than €10 million. The Count 1 Defendants' receipt of fees and kickbacks from the Count 1 Enterprise and their subsequent deposit or other financial transfers of such monies constituted violations of: (1) 18 U.S.C. § 1956 in that the Count 1 Defendants each knew that such financial transactions were intended to promote further predicate offenses, avoid reporting requirements, or otherwise conceal laundering of the funds; and (2) 18 U.S.C. § 1957 in that the Count 1 Defendants each knew that such financial transactions involved amounts exceeding $10,000 and that such monies were criminally derived from specified unlawful activity.

387.    J&T Banka and Postova Banka profited from the scheme to conceal the true ownership of companies controlled by Vitek by lending to Vitek at high interest rates and in amounts exceeding limits imposed by Czech law on the maximum amount of financing that a bank may provide to an individual borrower.

388.    The specific details of the monetary transactions are within Defendants' exclusive knowledge and control and will be identified in discovery and proven at trial.

> **(iii)    Inducement to Interstate or Foreign Travel in Violation of 18 U.S.C. § 2314.**

389.    The Count 1 Defendants' scheme to unlawfully deprive Plaintiffs of their partnership interests and investment proceeds, and to prolong that unlawful conduct by misleading Investhold regarding new agreements with Vitek, constitutes a scheme or artifice to defraud or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, within the meaning of 18 U.S.C. § 2314.

390.    The Count 1 Defendants having devised or intended to devise such a scheme, by which the Count 1 Defendants sought to defraud Plaintiffs of money or property having a value in excess of $5,000, in execution or concealment of the scheme Vitek and Ott, aided and abetted by CPI PG, J&T Banka, and Postova Banka and their agents and officers, induced representatives of Kingstown Capital to travel in interstate or foreign commerce in violation of 18 U.S.C. § 2314. The Count 1 Defendants' specific fraudulent inducements to travel include, but are not limited to, the following:

a.    Ott and Vitek, by means of wire communications into the United States from abroad, induced Kingstown Capital's board representative to travel to London in order to attend the February 25, 2013 ORCO Board of Directors meeting. The inducement to travel furthered the scheme by means of the fraudulent misrepresentations and material omissions that occurred during the trip. *See* ¶¶ 127-134.

b.    Ott and Vitek, by means of wire communications into the United States from abroad, induced Kingstown Capital's board representative to travel to Paris in order to attend the May 15, 2013 ORCO Board of Directors meeting. The inducement to travel

furthered the scheme by means of the fraudulent misrepresentations and material

omissions that occurred during the trip. *See* ¶¶ 144-146.

### (iv)    Interstate and Foreign Travel in Aid of Racketeering in Violation of 18 U.S.C. § 1952.

391.    The Count 1 Defendants' acts of money laundering in violation of 18 U.S.C.

§§ 1956 and 1957 described above constitutes specified unlawful activity within the meaning of

18 U.S.C. § 1952(b).

392.    Ott traveled to the United States in or about late January 2013 with the intent to

promote or otherwise carry on the concealment and laundering of funds used to further the Count

1 Defendants' scheme to defraud in violation of 18 U.S.C. § 1952(a)(1), (3). *See* ¶¶ 113-115.

### (d)    Scienter

393.    The Count 1 Defendants had the motive to commit the aforementioned predicate

acts of racketeering, as demonstrated by, among other things, the following facts:

    a.    Vitek obtained assets of companies at below-market prices and obtained

control over ORCO, CPI PG, and affiliates by diluting his partners and avoiding

disclosure requirements that would have triggered compulsory takeover offers. In the

process, Vitek also avoiding the need to honor his parity partnership with Mr. Cmejla and

Investhold. Vitek's attempt to lull Mr. Cmejla into forgoing corrective litigation

permitted the Count 1 Defendants to continue their lucrative but unlawful scheme

uninterrupted.

    b.    Ott stood to earn, and did earn, tens of millions of dollars in kickbacks as a

result of the Count Defendants' unlawful scheme. Ott was also able to remain as CEO of

ORCO in exchange for his agreement to help further Vitek's scheme to defraud Plaintiffs.

      c.      J&T Banka and Postova Banka profited from the scheme by lending to Vitek at high interest rates and in amounts far exceeding limits imposed by Czech law on the maximum amount of financing that a bank may provide to an individual borrower. J&T Banka also profited from buying and selling the Endurance Fund assets in sham sales.

394.    Each of the Count 1 Defendants had the opportunity to commit the aforementioned predicate acts of racketeering, as demonstrated by the fact that their scheme made it exceedingly difficult for Plaintiffs to identify undisclosed connections and coordination among the Count 1 Defendants to artificially deflate the value of and loot company assets.

395.    In addition, the circumstances surrounding the aforementioned violations of 18 U.S.C. §§ 1956, 1957, 1952, and 2314 and acts of mail and wire fraud demonstrate conscious misbehavior and knowledge by the Count 1 Defendants that they were engaging in a scheme to defraud Plaintiffs.

**(e)**    **Vicarious Liability**

396.    Each of the predicate acts by Vitek and Ott were committed within the scope of their employment, officership, or directorship positions at, or agency relationship with CPI PG. The predicate acts were each committed in furtherance of a scheme intended to and which did in fact benefit the Count 1 Enterprise by wrongfully depriving Plaintiffs of the value of their partnership interests and investments. Accordingly, CPI PG is vicariously liable for the RICO violations of the individual defendants herein.

397.    Vitek, Ott, and CPI PG further orchestrated the Count 1 Defendants' unlawful scheme through the affiliates of CPI PG, including ORCO and Czech Property Investments, a.s. Accordingly, Vitek, Ott, and CPI PG are vicariously liable for RICO violations by ORCO and Czech Property Investments.

**(f)      Causation and Damages**

398.    The unlawful actions of the Count 1 Defendants, and each of them, have directly, illegally, and proximately caused and continue to cause injuries to Plaintiffs in their business and property. Specifically, Investhold and its subsidiary Verali suffered the loss of property related to the 50% interest in the investments by Vitek that they were entitled to under the parity partnership, and the profits flowing therefrom, and the Kingstown Capital Plaintiffs suffered the loss of property related to their investment in ORCO, and the profits flowing therefrom, had the Count 1 Defendants not implemented their scheme. The Count 1 Defendants further harmed the Plaintiffs by artificially depressing the value of ORCO assets and selling those assets at below-market prices. The Count 1 Defendants paid members of the Count 1 Enterprise, including Ott, J&T Banka, and Postova Banka, high interest rates, fees, and kickbacks to which they were not entitled, further causing financial harm to the businesses in which the Plaintiffs had invested.

399.    Plaintiff seeks an award of damages in compensation for, among other things, the more than one billion dollars that the Count 1 Defendants stole from Plaintiffs. Pursuant to the civil remedy provisions of 18 U.S.C. § 1964(c), Plaintiffs are thereby entitled to recover three times the damages they sustained, and the recovery of reasonable attorneys' fees and costs of investigation and litigation, as well as any other relief as authorized by statute.

## SECOND CAUSE OF ACTION
### Federal Civil RICO, 18 U.S.C. § 1962(c)
### (Against Radovan Vitek and Jean-François Ott)

400.    Plaintiffs repeat and reallege paragraphs 1 through 399 as if fully set forth herein.

401.    This cause of action is asserted against Radovan Vitek and Jean-François Ott (the "Count 2 Defendants") and is asserted in addition to and in the alternative to the other RICO Causes of Action.

402.    Section 1962(c) of Title 18 of the U.S. Code makes it illegal for "any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt."

403.    Each Count 2 Defendant is a "person" capable of holding legal or beneficial interest in property within the meaning of 18 U.S.C. § 1961(3).

404.    Each Defendant violated 18 U.S.C. § 1962(c) by the acts described in the prior paragraphs, and as further described below.

(a)    **The Count 2 Enterprise: ORCO Property Group**

405.    From its formation and continuing to the present, ORCO Property Group ("ORCO") has constituted an enterprise within the meaning of 18 U.S.C. § 1961(4). ORCO is a public holding company traded on several stock exchanges and was, and is, distinct from the Count 2 Defendants. ORCO has engaged in, and its activities have affected, foreign and interstate commerce, including through transactions with individuals and business entities located in states or nations other than those in which the Count 2 Defendants operated. ORCO has directly and foreseeably affected commerce in the United States through the involvement of U.S. financial institutions and individuals in the affairs and investments of ORCO and its affiliates.

(b)    **Pattern of Racketeering Activity and RICO Predicate Acts**

406.    From around January 23, 2013 until around June 8, 2016, and perhaps continuing to this day, the Count 2 Defendants engaged in a pattern of racketeering activity within the meaning of 18 U.S.C. § 1961(5) and consisting of the predicate acts of racketeering within the meaning of 18 U.S.C. § 1961(1)(B) described in the First Cause of Action, *supra*, and other predicate acts to be identified after further investigation and discovery herein.

99

407.    Each of the Count 2 Defendants engaged in and aided and abetted two or more predicate acts of racketeering, and each committed at least one such act of racketeering after the effective date of RICO. The Count 2 Defendants played the same roles in the scheme and pattern of racketeering activity as set forth in the First Cause of Action, *supra*. The predicate acts of racketeering activity were related in that they were committed for the purpose of defrauding other investors of ORCO by compelling ORCO to sell its most valuable assets to affiliated persons and entities at below-market prices and to deny the Plaintiffs the benefits of their ownership interests in ORCO and the parity partnership with Investhold. In connection with this scheme, each Count 2 Defendant committed and aided and abetted acts of mail and wire fraud and money laundering.

408.    Through such patterns of racketeering activity, each of the Count 2 Defendants conducted or participated, directly or indirectly, in the conduct of the affairs of the ORCO in violation of 18 U.S.C. § 1962(c).

**(c)     Scienter**

409.    The Count 2 Defendants scienter is demonstrated by the facts set forth in the First Cause of Action, *supra*.

**(d)     Causation and Damages**

410.    The Count 2 Defendants have directly, illegally, and proximately caused and continue to cause injuries to Plaintiff in its business as set forth in the First Cause of Action, *supra*.

## THIRD CAUSE OF ACTION

### Federal Civil RICO, 18 U.S.C. § 1962(d)
### (Against All Defendants)

411.    Plaintiffs repeat and reallege paragraphs 1 through 410 as if fully set forth herein.

412.    Defendants have each unlawfully, knowingly, and willfully combined, conspired, confederated, and agreed together and with others to violate 18 U.S.C. § 1962(c) as described above, in violation of 18 U.S.C. § 1962(d).

413.    Each Defendant knew of the illegal activity – specifically, that Vitek and Ott were not fully and truthfully disclosing their connections to and ownership interests in companies they held out to be independent, and that Vitek was secretly undermining the value of ORCO, CPI PG, and affiliate assets and divesting Plaintiffs of their property interests. Each Defendant knew that Vitek, Ott, CPI PG, J&T Banka, and Postova Banka were committing numerous RICO predicate acts in support of the scheme.

414.    Each Defendant agreed to further the scheme, as demonstrated by, among other things, the following facts:

        a.      Radovan Vitek: Vitek was at the center of the conspiracy and had full knowledge of the entire scheme and the roles of each participant in the scheme. As explained above and in the first and second causes of action, Vitek directly participated in and arranged for others to commit multiple racketeering predicate acts.

        b.      Jean-François Ott: As described in the first two causes of action, Ott was Vitek's principal co-conspirator and directly participated in multiple criminal predicate acts to further the scheme.

        c.      CPI Property Group, S.A.: CPI PG knew of and agreed to the scheme directly and through its agents, Vitek and Ott. As detailed in the first two causes of

action, CPI PG participated in the scheme by committing two or more predicate racketeering acts.

       d.      J&T Banka, A.S. and Postova Banka, A.S.: J&T Banka and Postova Banka were active participants in Vitek's scheme and funded the acquisitions of assets at below-market prices and on behalf of straw purchasers. Through international wire transfers and agreements to encumber CPI PG, ORCO, and affiliate assets in exchange for debt, J&T Banka and Postova Banka agreed to the overall contours of the scheme devised by Vitek. Vitek also had close personal relationships with his contacts at those banks who facilitated the fund transfers.

       e.      Jan Gerner: Jan Gerner is the straw owner of Fetumar Development Limited, a Cypriot shell company controlled by Vitek. Jan Gerner conspired with Vitek and CPI PG to loot ORCO's assets, as demonstrated by Fetumar's November 2014 acquisition of over 30% equity in ORCO and Fetumar's subsequent sale of that interest to CPI PG in June 2016.

       f.      Milada Mala: Ms. Mala is Vitek's mother and business associate. Ms. Mala frequently acted as an agent or proxy for Vitek, specifically as the nominal owner of Czech Property Investments as well as the Czech companies Tandis, a.s. (through which Ms. Mala unlawfully acquired an ownership interest in CPI PG, which was then known as ORCO Germany) and Sidoti, a.s. (through which Ms. Mala purchased interests in the Endurance real estate funds from J&T Banka in a sham sale). Ms. Mala allowed Vitek to exercise control and all ownership rights over Czech Property Investments, Tandis, and Sidoti. In December 2010, Ms. Mala gifted Czech Property Investments to Vitek, who in turn transferred ownership to CPI PG in June 2014. In September 2017,

Ms. Mala transferred ownership of Sidoti to Gamala Limited (a company owned by Vitek). In June 2018, Ms. Mala transferred ownership of Tandis to Vitek.

g.     Lumir Safranek: Lumir Safranek is the straw owner of Kamoro Limited, a Cypriot shell company controlled by Vitek. Lumir Safranek created the shell companies Kamoro and Gamala and conspired with Vitek to loot ORCO's assets, as demonstrated by Kamoro's June 2013 acquisition of 8.65% equity in CPI PG.

h.     Pavel Spanko: Pavel Spanko is the straw owner Aspley Ventures Limited, a British Virgin Islands shell company controlled by Vitek. He was, at certain relevant times, a board member of ORCO. Pavel Spanko conspired with Vitek and CPI PG to loot ORCO's assets through Aspley's November 2014 acquisition of over 30% equity in ORCO and Aspley's subsequent sale of that interest to CPI PG in June 2016.

i.     Julius Strapek: Julius Strapek is the straw owner of Jagapa Limited, a Cypriot shell company controlled by Vitek, and a board member of J&T Banka. Julius Strapek conspired with Vitek and CPI PG to loot ORCO's assets and, together with J&T Banka, to finance Vitek's scheme to divest Plaintiffs of their partnership and property interests in CPI PG and ORCO in connection with at least Jagapa's May 2016 acquisition of over 30% equity in ORCO and Jagapa's subsequent sale of that interest to CPI PG in June 2016.

415.     Further evidence of an agreement among Defendants is peculiarly within the knowledge and control of Defendants.

416.     The participation and agreement of each Defendant was necessary to allow the commission of the pattern of racketeering activity described in the first two causes of action. Beyond the direct participants in the scheme who are named defendants in the first two causes of

action, the additional individual defendants (Jan Gerner, Milada Mala, Lumir Safranek, Pavel Spanko, and Julius Strapek) played key roles by providing the outward appearance of third-party investors who were independent of Vitek and Ott. Lending the use of their names and the use of their shell companies to the scheme enabled Vitek and Ott to evade regulations and disclosure requirements that would have alerted Plaintiffs to the fraud and have allowed Plaintiffs and others to protect their interests. It was also foreseeable that by participating in the scheme as straw purchasers, Plaintiffs would have been misled as to Vitek's and Ott's true ownership interests and made it more difficult to detect the predicate acts of racketeering. Without the individual Defendants active participation in the scheme, Vitek and Ott would not have been able to covertly control and loot the assets of CPI PG, ORCO, and affiliates and divest Plaintiffs of their property interests.

417.    As described in the first two causes of action, as a direct and proximate result of violations of 18 U.S.C. § 1962(d) by Defendants, Plaintiffs suffered an immediate and direct injury from the Defendants' racketeering activity. Specifically, Plaintiffs were divested of and lost the profits flowing from their investments in CPI PG, ORCO, and affiliates that they would have held were not for the Defendants scheme to conceal their true ownership and control over those entities. Plaintiffs' damages include, but are not limited to, the profits they would have earned from their investments in ORCO, CPI PG, and affiliates; other lost business opportunities (including other of Vitek's investments that Investhold, through Mr. Cmejla, would have invested in under the parity partnership); and attorneys' fees and costs, including attorneys' fees and costs associated with exposing and pursuing redress for Defendants' criminal activities.

## FOURTH CAUSE OF ACTION

### Tortious Interference with Contract
### (Against J&T Banka, Postova Banka, Ms. Mala, and Vitek)

418.     Plaintiffs repeat and reallege paragraphs 1 through 417 as if fully set forth herein.

419.     Defendants Vitek, Ms. Mala, and J&T Banka tortiously interfered with obligations CPI PG owed to Investhold under the terms of hundreds of contracts.

420.     Defendants knew of CPI PG's contracts with entities affiliated with Mr. Cmejla, and knew that Investhold had a significant interest in CPI PG and had a right to be involved in significant business decisions of CPI PG.

421.     Defendants intentionally procured and participated in the breach of these agreements by causing the registration and issuance of new shares of CPI PG, and allowing those shares to be used as collateral for other loans.

422.     As alleged in detail above, the central goal of Defendants' campaign against Plaintiffs was to dilute and divest Plaintiffs of their interest in CPI PG so that Vitek could get control of the assets of CPI PG.

423.     Plaintiffs suffered damages as a result of Defendants' interference.

## FIFTH CAUSE OF ACTION

### Conversion
### (Against All Defendants)

424.     Plaintiffs repeat and reallege paragraphs 1 through 423 as if fully set forth herein.

425.     Defendants wrongfully exercised dominion and control over money and property belonging to Plaintiffs through their scheme to loot ORCO's assets and deprive Plaintiffs of their rightful share of profits in CPI PG investments.

426.     Plaintiffs suffered damages as a result of Defendants' conversion.

## SIXTH CAUSE OF ACTION

### Unjust Enrichment
### (Against Vitek)

427. Plaintiffs repeat and reallege paragraphs 1 through 426 as if fully set forth herein.

428. Mr. Cmejla, Investhold, and Verali enjoyed continuing business relations not amounting to a contract with Vitek.

429. Vitek had promised Mr. Cmejla, Investhold, and Verali at various times that they were equal business partners and could become co-owners of entities that held Vitek's entire interest in CPI PG.

430. Vitek benefited from the financing the Investhold Group provided and from the registration and issuance of additional shares in CPI PG, which had the effect of diluting Investhold's potential equity interest in CPI PG.

431. Equity and good conscience require restitution by Defendant Vitek to Plaintiffs.

## SEVENTH CAUSE OF ACTION

### Common Law Fraud
### (Against Vitek)

432. Plaintiffs repeat and reallege paragraphs 1 through 431 as if fully set forth herein.

433. Vitek falsely represented to Plaintiffs Investhold and Verali his intent to treat them as equal partners, and to give them an equal interest in Czech Property Investments in return for their investments.

434. Plaintiffs Investhold and Verali relied on this commitment in making their investment pursuant the terms described above.

435. At the time Vitek made these representations, he had no intention of honoring this commitment. Rather, he intended to dilute Plaintiffs' interest in CPI PG by registering and issuing new shares of CPI PG and conveying them to entities he alone controlled.

106

436.    Plaintiffs suffered damages as a result of Vitek's fraud.

## EIGHTH CAUSE OF ACTION

### Common Law Fraud
### (Against Vitek and Ott)

437.    Plaintiffs repeat and reallege paragraphs 1 through 436 as if fully set forth herein.

438.    Vitek and Ott caused numerous false board minutes and other communications to be directed toward the Kingstown Capital Plaintiffs in connection with their scheme to loot ORCO of its assets and seize control of the company under false pretenses. *See* Mail and Wire Fraud Allegations in Count 1, *supra*.

439.    The Kingstown Capital Plaintiffs relied on these fraudulent minutes and communications, and Vitek and Ott knew and intended that the false statements would prevent the Kingstown Capital Plaintiffs from discovering their covert coordination.

440.    The Kingstown Capital Plaintiffs were damaged as a result of the fraud, as the Kingstown Capital Plaintiffs would have exposed Vitek and Ott's criminal conspiracy sooner and prevented the looting of valuable ORCO assets.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs prays for judgment as follows:

1.    An award in favor of Plaintiffs against Defendants for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including:

a.    Compensatory damages and monetary losses due to, among other things, breach of contract, lost profits and enterprise value, and other consequential damages;

b.    Punitive damages;

c.    Attorneys' fees and costs;

d.    Pre- and post-judgment interest at the maximum legal rate; and

e.      Such other and further relief as the Court may deem just and proper.

**<u>Jury Trial Demanded</u>**

Plaintiffs demand trial by jury on issues so triable.

Dated:  New York, New York
          April 10, 2019

                                        Respectfully Submitted,

                                        BOIES SCHILLER FLEXNER LLP

                            By:     /s/ Matthew L. Schwartz
                                        Matthew L. Schwartz
                                        Jaime D. Sneider
                                        David Nelson

                                        Boies Schiller Flexner LLP
                                        55 Hudson Yards
                                        New York, New York 10001
                                        Telephone:  (212) 446-2300
                                        Facsimile:  (212) 446-2350
                                        Email:  mlschwartz@bsfllp.com
                                                    jsneider@bsfllp.com
                                                    dnelson@bsfllp.com

                                        *Attorneys for Plaintiffs*